## MARGARET REIL et al. *vs.* ROBERT H. WEMPE et al.

*Undue Influence—Transfers by Decedent—Evidence.*

If one disposes of his estate in the exercise of his own will and judgment, the court is not authorized to nullify his donations because of a judicial belief that they may have been too generous, or that they disregarded considerations of kinship which should justly have been recognized.                    p. 451

The act of the owner of a savings bank account in causing it to be entered in the name of another, in trust for such other and himself, subject to the order of either, and the balance at the death of either to belong to the survivor, creates a complete and irrevocable trust.                    pp. 454, 455

The testimony of disinterested witnesses showing that gifts were made by decedent, a man of mature years and experience, and of undoubted mental capacity, in the exercise of a competent, independent, and deliberate judgment, one of such gifts, involving the transfer of a savings bank account, having been discussed repeatedly with an officer of the bank, and the other, involving a conveyance of ground rents, having been the subject of interviews with his counsel, in each case the strength and persistence of his purpose having prevailed over earnest advice against the contemplated action, *held* that there was no

undue influence exerted by the donee, a girl nineteen years old, her only influence upon the donor appearing to have been that of helpful kindness.                                          p. 457

Confidence on the part of a donor in those to whom he made valuable gifts, relating solely to their disposition to treat him as a member of their family and to nurse him through the period of an incurable disease from which he was suffering, was not a relationship in which, as the result of confidence reposed by him, a superior influence over him was acquired.
                                                              p. 458

Proof that the gifts were made in pursuance of the donor's voluntary, positive, and capable purpose, and that he had the benefit of disinterested and competent advice which he held for some time under consideration but finally rejected, is sufficient to satisfy any burden of proof created by the existence of confidential relations.                                     pp. 458, 459

That one who knew that he had but a few months to live gave a considerable portion of his estate to members of a family with which he had been intimate for many years, and members of which had cared for him during a former illness and were then giving him their care and attention, did not involve such an unnatural course of action on his part as to justify a suspicion that he was a victim of undue influence.           p. 460

That donations made by decedent far exceeded the value of services rendered him by the donees did not indicate undue influence, it being his right to determine for himself the importance and value to him of such services.              p. 460

That members of the family of one to whom decedent made a deed of ground rents by way of gift, inquired of an acquaintance, a lawyer, as to the validity of such deed, did not indicate that such deed was procured by undue influence.        p. 461

While the fact that decedent had expressed a purpose to provide out of his estate for certain nephews was worthy of consideration upon the question whether subsequent gifts, disposing of practically all his estate, to persons not related to him, were procured by undue influence, such fact is not sufficient to invalidate such gifts.                              pp. 461, 462

That a member of the bar, while on a social visit to a home, was consulted, by members of the family there resident, as to

the legal validity of certain transactions, does not establish that he was acting for them in a professional capacity, so as to render communications between him and them privileged.

p. 462

The validity of transfers of property, by way of gift, finally consummated by decedent, could not be affected by any subsequent change of mind on his part as to the expediency of such transfers.

p. 463

One's title to property represented by papers in his safe deposit box is not divested by the mere fact that he gives to another access to such box, and on his death it is proper that such papers be delivered to his personal representative.

p. 464

*Decided April 10th, 1924.*

Appeal from the Circuit Court of Baltimore City (DUFFY, J.).

Bill by Robert H. Wempe and others against Margaret Reil and others. From a decree for plaintiffs, defendants appeal. Affirmed in part and reversed in part.

The cause was argued before THOMAS, PATTISON, URNER, ADKINS, OFFUTT, and DIGGES, JJ.

*Alexander Armstrong* and *Henry H. Dinneen,* for the appellants.

*Stephen W. Leitch* and *Edward L. Ward,* for the appellees.

URNER, J., delivered the opinion of the Court.

In September, 1922, George H. Wempe, a resident of Baltimore, learned that he had pulmonary tuberculosis, and that, if he remained in the city, he would probably live only six or eight months. To his physician, Dr. George J. Heck, from whom he obtained that information, he said that he wanted to know whether he could live or not, because he

wished "to fix matters" so that the Reil family who "nursed him and took care of him" should receive his property, and that he did not want to have it go to "his people." Mr. Wempe, who was a bachelor about fifty-seven years of age, was then living as a boarder in the home of Mary Quinn, a member of the family he mentioned, and he continued to live there until the time of his death on March 13th, 1923. His health failed rapidly in the fall of 1922, and from January 13th, 1923, to the time of his death he was confined to his bed and was nursed by Mrs. Quinn and her mother, Mrs. Reil. From November 1st, 1922, to January 20th, 1923, Mr. Wempe made various transfers of real and personal estate valued at approximately $12,000 to members of the Reil family, and since his death intestate the appellees, as his heirs and next of kin, have brought this suit in equity to have those dispositions annulled on the theory that they were procured by undue influence. The lower court so decreed, and this appeal has resulted.

There is no dispute as to Mr. Wempe's competency to make the transfers which the decree below vacated. It was his clear legal right to select the appellants as the objects of his bounty. If he disposed of his estate in the free exercise of his own will and judgment, the court is not authorized to nullify his donations because of a judicial belief that they may have been too generous, or that they disregarded considerations of kinship which should justly have been recognized. *Simpson* v. *League,* 110 Md. 293. In view of the unquestioned mental capacity of the donor, and there being no suggestion in the evidence that any fraud or deception was practiced, we have only to inquire whether he was unduly influenced in making the gifts in controversy.

The intimate association of Mr. Wempe with the Reil family existed for many years before his death. About five years before that event, when he had retired from his employment as route superintendent for a brewing company, and was living at the home of a brother-in-law, he became afflicted with a large carbuncle on his neck. He mentioned

to Mrs. Reil the fact that he had been advised to enter a
hospital for treatment, but said he was unwilling to do so,
and she suggested that he come to her home to have the car-
buncle treated, and consequently he went there daily for
that purpose during a period of several months. Mrs. Reil's
daughter, Catherine, afterwards Mrs. Barry, dressed the
carbuncle as often as four times a day. No charge was
made for these attentions. As an evidence of his appreciation,
Mr. Wempe gave Miss Catherine fifty dollars in gold and
is said to have also given her a diamond ring. About three
years later he moved from his sister's home to that of Mrs.
Quinn on North Avenue, nearly opposite Mrs. Reil's dwell-
ing. For his room and board he paid Mrs. Quinn nine dol-
lars a week. He spent a great deal of his time in Mrs.
Reil's home and became very fond of all the members of
the family. The principal transfers in litigation were made
to her unmarried daughter, Margaret, but there appears to
have been an understanding that she would divide the money
and property she received with her sisters, Mrs. Quinn and
Mrs. Barry, and her brother, Lawrence Reil, and his chil-
dren, in certain proportions.

The nearest relatives of Mr. Wempe were two sisters, a
brother, and six nieces and nephews, none of whom were
dependent upon him, and with all of whom he apparently
was on friendly terms during the latter part of his life,
although a number of years previously there had been an
estrangement. There is evidence that he expressed a special
interest in two of his nephews. The estate of Mr. Wempe
was mainly derived from that of his mother, who died in
1901.

On November 1st, 1922, Mr. Wempe transferred to Mrs.
Quinn five shares of the capital stock of the Consolidated
Gas Electric Light and Power Company of Baltimore City.
This gift was made, as Mrs. Quinn testified, because she
"had lost some money in a certain concern, and he said he
would not let me lose that money, and he said, 'I'll give you
$500 because you were so good to me.' "

About two weeks later Mr. Wempe went alone to the northeast branch of the Calvert Bank, where he had a savings account in which there was a balance of $3,287.21, and caused the account to be entered in the name of Margaret A. Reil, in trust for herself and George H. Wempe, subject to the order of either, and the balance at the death of either to belong to the survivor. Mr. William T. Helmsley, who was manager of the bank's northeast branch, testified in regard to the transaction as follows: "As far as I can recollect, Mr. Wempe spoke to me in reference to this matter some six years ago. At that time he had some affection of the neck, * * * and I did not see him again for a few weeks, perhaps longer. He came back and made a fifty-dollar withdrawal and asked me if I could either give him that in gold or a gold note, and he stated that he wanted that as a gift to someone who had nursed him; that this party had been very nice to him and he wanted to show how he appreciated it, and he said if I should ever want to transfer my account to some name so a certain individual could get my money, how could I go about it? And I told him the different ways he could go about that according to bank procedure." In August or September, 1922, Mr. Helmsley said, "Mr. Wempe came to see me, asked to see me personally in my office. He told me that he had—that he believed he had some incurable disease; * * * He said I come to you in a confidential way; * * * I want to speak about certain matters that concern me. He told me he had some difficulty with his family of long standing, and that on account of their attitude towards him, he did not feel that he wanted any of his estate to go to them. * * * I said, 'Why don't you leave a will, if that is the way you feel about it?' * * * and he said, No; I want this thing that after—if anything happens to me there is no question about who gets the money * * * In our conversation I told him that if I were in his place, I would go a little slow about changing an account over to any individual outside of his family. I said, George, I feel that you have some obligation to your family—your

brothers and sisters. He said, 'That does not enter into it at all. I am asking you a question what I should do to transfer this money to a young lady whom I want to have every cent I have." The court inquired: "Did he give you the name?" and Mr. Helmsley replied: "Yes; Miss Margaret Reil. He told me he had known this girl from her childhood up, and he could trust her and wanted her to have the money." Continuing, Mr. Helmsley said: "There was an interim of about two months, as I can recall. Mr. Wempe came in off and on and asked questions about it, and asked whether I was positive this thing would work without any lawsuit or trouble, and I told him that as far as my experience went I never knew one of these accounts to be set aside only unless insanity could be proved. He said: 'I want you to bear in mind I want this young lady to have my money under any circumstances and I am perfectly all right in talking to you about it.' " In referring to his family, Mr. Wempe told Mr. Helmsley that "in times when he was sick and needed a home they did not seem to want him," and in regard to Mrs. Reil's family he said that he had been associated with them for a number of years and "they had shown him every kindness and taken him as a member of the family when he was sick, he had a home there and they nursed him." "The next occasion," said Mr. Helmsley, "was when he came in some time the early part of November * * * and told me he had definitely made up his mind he wanted to transfer this account to Miss Margaret Reil's name. * * * I again told him I would not act in haste if I was in his place. It was rather a serious thing to give all of his estate away while he was living, without giving his family some consideration. He told me he thought this thing over at length, and this was exactly what he wanted to do. I gave him the card, and he asked me to make out the card so there would not be any mistake about it, and I filled in the name and got him to sign that card and got him to take it home for her to sign." It placed the account under the terms of the trust already described, which was

complete and irrevocable. *Milholland v. Whalen,* 89 Md.
212; *Littig v. Mount Calvary Church,* 101 Md. 494; *Mul-
finger v. Mulfinger,* 114 Md. 463; *Stone v. National City
Bank,* 126 Md. 231; *Farmer v. Farmer,* 137 Md. 84.

On December 1st, 1922, Mr. Wempe executed a deed con-
veying to Margaret Reil seven ground rents subject to his
life estate therein reserved. The deed was prepared by
Harry M. Benzinger, Esquire, who had been Mr. Wempe's
counsel for many years. When asked to state the circum-
tances under which the deed was prepared and executed,
Mr. Benzinger testified: "Mr. Wempe had been to my office,
I think, probably twice before and requested me to make this
deed out, and I objected to making the deed out * * *. I
told him I thought it was very bad policy for a man to get
rid of his property while he lived; that he might want to
take it back again, and that it was not a good thing to do,
and to go home and think it over. And then he came back
again and he told me he wanted to draw the deed." Accord-
ing to Mr. Benzinger's recollection, it was not until Mr.
Wempe had called the third time to see him in reference
to the deed that it was finally prepared. It was executed in
Mr. Benzinger's office. On the day after its execution it was
recorded. In regard to Mr. Wempe's physical condition at
that period Mr. Benzinger testified: "He said he was going
to make a die of it, and when he came to execute the deed
he had all the indications of it." But in regard to the grant-
or's mental condition Mr. Benzinger said it was "clear as a
bell." In answer to a question as to whether Mr. Wempe
stated "what the prior consideration was which moved him
to make the deed," Mr. Benzinger said: "Yes; the treatment
that he had received at the hands of the Reil family. Q.
And what did that treatment consist of? A. He said they
had been everything to him that his own parents and brothers
could have been."

Early in November, 1922, Mr. Wempe called to see his
sister, Mrs. Coxon, who lived at Overlea, and asked her to
pay a loan of $1,900 which he had made to her in 1914, and

for which she had given her promissory note. On December 23rd Mrs. Coxon gave her brother a check for $2,100 in payment of the note and interest. The check was endorsed by Mr. Wempe and by Margaret Reil and deposited to the credit of the account in the northeast branch of the Calvert Bank.

On January 10, 1923, Mr. Wempe went with Margaret Reil to the Safe Deposit and Trust Company's office, introduced her to the custodian of its vault, and had her name entered on its books as one entitled to have access to his safe deposit box. There were in the box two certificates of Consolidated Gas Electric Light and Power Company stock, for five shares each, which Mr. Wempe endorsed, and which Miss Reil, at his request, on January 16, 1923, surrendered to the corporation in return for certificates in the names of her brother, Lawrence, and her sister, Catherine. The new certificates were placed in the safe deposit box, and Miss Reil later delivered them to the transferees, as Mr. Wempe had directed.

A promissory note of Adam A. Bittner and wife for $1,000, held by Mr. Wempe, was assigned by him to Margaret Reil on January 20th, 1923. Mr. Bittner, who is a police officer, testified: "I went to see Mr. Wempe and he was in bed * * * and he looked very bad, although I felt satisfied that he knew what he was talking about. And I said, 'No doubt, you sent for me for some money' * * * 'No,' he said, 'I am going to die, and the reason I sent for you,' he says, 'that money that you owe me, I don't want you to pay to anyone at all.' He said, 'I don't want you to pay that to anybody at all but Miss Margaret Reil,' and she was standing there. Q. Did he say why he wanted you to pay that to Miss Margaret Reil? A. He says, 'She has been faithful to him during all his sickness,' and then he was getting very weak. * * * " This interview occurred about four weeks before Mr. Wempe died.

Some time in December, 1922, Mr. Charles Trageser visited Mrs. Reil's home, as he testified, and had a conversa-

tion with Mr. Wempe, in which his conveyance of ground rents to Margaret Reil was mentioned as having been reported in the "Daily Record," and Mr. Wempe said: "Yes; he had made a disposition to Margaret Reil. He thought Margaret was a good girl, and that she would carry out his wishes as he intended." Several times previously, "months before," Mr. Trageser said, he spoke of "transferring his property, dividing it among the Reil family. * * * He told me that the Reil family had been very good to him, that none of his people had done anything for him, and that he wanted to repay them in some shape or form."

All of the witnesses to whom we have referred were wholly disinterested. Their testimony tends strongly to prove that the transfers which are sought to be vacated were made by Mr. Wempe in the exercise of a competent, independent, and deliberate judgment. The assignment of his bank account was discussed repeatedly with an official of the bank, and the conveyance of his ground rents was the subject of several interviews with his counsel, and in each instance the strength and persistence of his purpose prevailed over the earnest advice he received against the action which he contemplated. Those dispositions were made by a man of mature years and experience, and of undoubted mental capacity, to a girl nineteen years of age whose only influence upon him appears to have been that of helpful kindness. The opinion of this Court in *Barron v. Reardon,* 137 Md. 313, refers to the "influence of affection, attachment, or gratitude, which does not make a gift void, and the more especially when it is but the execution of a long cherished purpose."

There is no evidence that Margaret Reil or any of the members of her family, with whom the donations she received from Mr. Wempe were to be shared, had any connection whatever with his arrangements for the transfer of his bank account and ground rents. It is argued that his associations with them created a confidential relationship which placed upon them the burden of proving not only

that he made the gifts voluntarily and with full understanding of their effect, but also that he made them after having had the benefit of competent and independent advice. *Coburn* v. *Shilling,* 138 Md. 199. It would seem to be extending the doctrine of confidential relations very far to apply it to Mr. Wempe's associations with the Reil family at that period. The intended beneficiaries of these transactions were the children and grandchildren of Mrs. Reil, who was not herself to be included as a donee for the reason, assigned by Mr. Wempe to one of the witnesses, who testified: "He said he wanted Mrs. Reil's children and the two grandchildren to get everything he had. He says, 'Mrs. Reil has all she wants. She is comfortably fixed, although she deserves the money, but I am leaving it to her children.' " At the period of the bank account and ground rent transfers, Mr. Wempe was a daily visitor in Mrs. Reil's home and a boarder in that of her daughter, Mrs. Quinn, and was treated like one of the family, but there is nothing in the proof to indicate that any of those members were consulted as to his business affairs, or that any of his property interests were confided to their care. The confidence which he undoubtedly reposed in them appears to have related solely to their disposition to treat him as a member of the family and to nurse him through the period of his incurable disease. It was not a relationship in which, as the result of confidence reposed by him, a superior influence over him was acquired. *Chase* v. *Grey,* 134 Md. 619.

But if it be assumed that the relations between Mr. Wempe and the members of the Reil family were such as to justly place upon them the burden of proving the assignment of the bank account, the conveyance of the ground rents, and the subsequent transfers, to have been made voluntarily, intelligently, and after competent and independent advice on the subject, we are clearly of the opinion that they have fully performed that duty. It would be difficult to produce more complete and convincing proof of such a fact than is afforded by the evidence in this case. It is not

only proved that the gifts were made in pursuance of the donor's voluntary, positive, and capable purpose, but that he had the benefit of disinterested and competent advice which he held for some time under consideration but finally rejected. The rule as to independent advice in regard to dispositions of property to one sustaining a confidential relation to the donor does not require that the advice be accepted. In this case the refusal of Mr. Wempe to be guided by the counsel he received, under the circumstances proved, is a significant and potent fact supporting the conclusion that he was disposing of his property in accordance with his own independent judgment and dominant will.

The disputed assignments of the bank accounts and ground rents have been chiefly referred to because they were the most important of the transfers which are sought to be annulled. In our judgment, those donations are conclusively proved to be valid. There is no evidence in the record which in our judgment justifies the belief that they were unduly influenced or were made from any motive other than that of gratitude for past, continuing, and future ministrations. But the same motive prompted the other gifts against which the suit is directed. All were made in pursuance of a carefully considered and repeatedly declared purpose. Only one of the gifts we have mentioned, that to Mrs. Quinn of five shares of Consolidated Gas Electric Light and Power Company stock, preceded the interviews with Mr. Helmsley and Mr. Benzinger, in which Mr. Wempe was advised against making the transfers then under consideration. That advice was broad enough to warn him against making the subsequent donations. Notwithstanding this caution he carried out his definite intention to provide for the children and grandchildren of the family with whom he was living. It was in partial execution of this general design that the transfer of stock to Mrs. Quinn was made at an earlier date. This was after he told Dr. Heck "that he wanted the people that nursed him and took care of him to have his property." The answer to the bill of complaint states that five shares of

the same stock were transferred to Margaret Reil by Mr.
Wempe many months before his death as a present in antici-
pation of her eventual marriage. No particular reference
was made to this gift in the testimony.

By the benefactions here assailed Mr. Wempe is said to
have stripped himself during his lifetime of his entire estate.
This is supposed to be such an unnatural action as to sug-
gest the probability that it was produced by influences which
the law condemns. The facts do not support that theory.
In the most valuable portion of his property Mr. Wempe
reserved an estate for life. But the general effect of his
gifts was not to deprive him of an estate upon which he
might for a normal period of life have been dependent. In
disposing of his possessions he acted not with the prospect
of long continued life, but in the certain anticipation of his
early death. It was his plan and purpose to make effectual
provision in his lifetime for those who were giving him the
care and attention he needed during the period of his steadily
declining health. In view of the conditions under which
he was living, and was soon to die, the course he pursued
does not appear to have been so unnatural as to justify a sus-
picion that he was the victim of undue influence.

It is urged that the donations he made to the appellants
far exceeded the value of the service they rendered. The
testimony proves that his gifts were intended to express his
apprciation of kindness and care which had for years con-
tributed to his comfort and pleasure, and which he knew
would be continued through the period of his last illness
upon which he had entered. It was his right to determine
for himself the importance and value to him of such atten-
tions.

The point was made that Mr. Wempe's brother and sister
were not left alone in the room with him when they came
to see him, and that when he went to their homes he was
accompanied by a member of the Reil family. The proof
shows that he was not confined to the house until some time
after the principal gifts in controversy were made, and he

apparently went alone to see his sister in reference to the payment of her promissory note. Subsequently his condition became such as to make it necessary that he should have the constant attention which Mrs. Reil and her daughter bestowed. The testimony fails to convince us that there was any design to interfere with the freedom of his communications with his relatives.

The appellees find ground for suspicion in the fact that Mrs. Reil and other members of her family made inquiries of Mr. Trageser, one of their visitors, who was a lawyer, as to whether the deed to Margaret Reil for the ground rents would be effectual. It was testified that Mr. Wempe himself manifested an interest in that question, and at his request, Mr. Barry, the son-in-law of Mrs. Reil, inquired of some friends in Washington who were members of the bar, whether they thought that transfers like those made to Miss Reil could be successfully attacked. The concern of Mr. Wempe that his gifts should not be invalidated was not an indication that he had made them under coercion. He naturally anticipated the disappointment of his relatives, and his anxiety to have the gifts sustained is a fact which, under the circumstances, tends to fortify their validity. The inquiries from members of Mrs. Reil's family, addressed to Mr. Trageser, related to a recorded deed which had been reported in the "Daily Record" and had thus been given full publicity. The deed was mentioned by him as having been so reported. It was a subject of importance to the family, and their request for the views of the visiting lawyer in regard to the deed does not suggest to our minds that undue influence induced its execution.

There was testimony to the effect that Mr. Wempe had expressed a purpose to make some provision out of his estate for the two nephews to whom we have already referred. The most definite expression of such a purpose was made more than two years before his death. During the last half-year of Mr. Wempe's life, one of the nephews had been living in California and for two years or more the other had been

in Canada.    The existence of an earlier intention to pro-
vide for them is worthy of consideration upon the question
we are deciding, but it is not sufficient to invalidate the later
and different purpose which he actually accomplished.

At the close of all the testimony to which we have made
reference, Mr. Trageser was recalled to the witness stand
and testified that he had a conversation with Mrs. Reil,
shortly after Mr. Wempe's death, in which she said that two
or three days before that event Robert Wempe had come to
see his brother George, and no member of her family was in
the room, and that "they heard George Wempe crying, and
after Robert left, they went up to him and asked him why
he was crying, and he said he thought he had made a mis-
take."    "Q. Did she say anything else as to how he said he
wanted his property to go ?    A. Well, I believe that she did
say that he should have left it to his people.    I might say
this: The conversation took place sometime ago, and I have
not visited the Reils but infrequently since that time, and
the whole thing is very faint in my recollection."    The lat-
ter statement was further emphasized by the witness when
he said:    "Whether he meant all of the estate or part of it
or just a little bit, I don't know."    It was denied by Mrs.
Reil, and also by Mr. Barry, who was present at the inter-
view with Mr. Trageser, that she had quoted Mr. Wempe as
having expressed any dissatisfaction with the disposition he
had made of his estate.    The defendants objected to the ad-
mission of Mr. Trageser's testimony as to his interview with
Mrs. Reil on the ground that he was counsel for herself and
family, and hence the communication, if made, was privi-
leged.    The circumstances under which Mr. Trageser was
consulted by Mrs. Reil and members of her family on the
occasions of his social visits to their home, do not support
the theory that he was acting in a professional capacity.    28
*R. C. L.* 553 ; 40 *Cyc.* 2367.

As Mrs. Reil and Robert Wempe were both parties to the
suit, neither was asked whether George Wempe, the dece-
dent, actually received a visit from his brother or made the

subsequent statement to which the remark attributed to Mrs.
Reil by Mr. Trageser referred. If Mrs. Reil made such a
remark, and if it correctly described the incident it men-
tioned, then it would appear that two or three days before
his death, George Wempe, after an interview with his brother
Robert, told Mrs. Reil that he had made a mistake and that
he should have made some provision for "his people." If
he thus expressed regret that he had not provided for his
relatives, he clearly showed his realization that the previous
dispositions of his property were accomplished facts. There
was no suggestion by him that any of them be revoked. It
is not certain from the testimony that he would have wished
them to be largely reduced. Any change of mind which he
may have then experienced could have no effect upon trans-
fers of property which he had finally consummated. *Reed*
v. *Reed,* 101 Md. 138. They were made with full appreci-
ation of his various relationships, in pursuance of a volun-
tary and deliberate purpose, in the exercise of rational fac-
ulties, and after competent independent and disinterested
advice. There is no adequate ground, in the law or the
proof, upon which we should feel at liberty to defeat the
gifts which he perfected under such conditions. As said in
the opinion delivered in *Simpson* v. *League,* 110 Md. 293,
it is clear that "the law concedes to a person of sound mind
the right to dispose of his property in any way he may deem
proper, not inconsistent with its policies, and with such a
person, when there is an absence of fraud or imposition,
there is no such thing as an equitable incapacity and a gift
voluntarily made and completed by him will not be set aside
because he subsequently changes his mind and regrets the
transaction or because the Court regards his act as absurd
or improvident. *Kennedy* v. *McCann,* 101 Md. 651; *Bauer*
v. *Bauer,* 82 Md. 241; *Reed* v. *Reed, supra; Gunther* v.
*Gunther,* 69 Md. 560; *Goodwin* v. *White,* 59 Md. 509; *Vit-
ters* v. *Beaumont,* 1 Vern. 100; *Wilson* v. *Farquharson,* 5
Md. 139."

A review of the cases cited in the argument would unduly prolong this opinion. In none of them have we found a decision with which, in view of the special facts, our conclusion in this case is inconsistent. Upon evidence no more persuasive than that upon which our present ruling is based, this Court has sustained transfers, attacked on the ground of undue influence, in some of the cases we have previously cited.

The decree required the contents of Mr. Wempe's safe deposit box to be delivered to his personal representative. There is no proof as to what the box contained other than the certificates for the stock which he transferred in his lifetime. If there remained in the box at the time of his death any assets which were not the subject of his perfected gifts, his title to such property was not divested by the mere fact that Miss Reil was given access to the box, or by any other act to which the evidence refers. It is inferable from Miss Reil's testimony that there were papers, other than the stock certificates, in the box, but as she had not examined the other papers she was unable to give any information as to their nature. Any untransferred property interests, which those papers may represent, have passed to the persons entitled to Mr. Wempe's estate in course of administration or inheritance. The provision of the decree in reference to the contents of the box will be affirmed, to the extent indicated, but in other respects it will be reversed.

> *Decree affirmed in part and reversed in part, and cause remanded, the appellants and appellees to pay their respective costs*