GEORGE M. BOLLACK, ET AL. *v.* JOHN BOLLACK, ET AL.

[No. 55, October Term, 1935.]

408

*Decided January 15th, 1935.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*W. Le Roy Ortel,* for the appellants.

*Isaac Lobe Straus* and *Herbert R. O'Conor,* for the appellees.

OFFUTT, J., delivered the opinion of the Court.

Peter Bollack, Sr., on April 16th, 1934, died in his eightieth year, at the home of his children, William, Mary and Eva, at 2826 Elliott Street, Canton, Baltimore, Maryland. He left to survive him five children, John, William, Benhardt, Mary, and Eva, and George M. Bollack, Emma T. Barnes, and Nathanial V. Bollack, children of Peter Bollack, Jr., a deceased son.

Until he retired, he had been a cooper in the employ of the Standard Oil Company. His education stopped at the second or third grade in school, he could write his name, and possibly read. For some time before his death he

was "blind in one eye" and his "hearing was not altogether good." The home in which he lived was a modest one, and for some time prior to his death his two daughters were rather put to it to make both ends meet. They had been employed in a shirt factory, but it had closed, and they were for a time apparently without employment and without resources. The home was poorly equipped, it had neither electricity nor a bath tub, and the cooking was done on a wood stove or a two-burner gas stove.

In 1927 or 1928 Peter Bollack, Sr., received from the estate of Joseph H. Pfister between $30,000 and $40,000 in cash, and on May 8th, 1929, he opened an account with the Canton National Bank with a deposit of $6,650, which was increased from time to time until it exceeded, in 1931, $35,000. On June 20th, 1933, that account was closed, and the amount then credited to it, $32,900, redeposited in six different accounts, the amount deposited to the credit of each of five accounts at that time was $6,000, and the balance, $2,900, was deposited to the credit of "Peter Bollack in trust for himself and Eva Margaret Bollack, joint owners, subject to the order of Peter Bollack, balance at the death of either to belong to the survivor." Each of the other five deposits was in the same form, except that in four of them the name of one of the other four children appeared instead of the name of Eva, and in the fifth the name of Eva appeared as in the $2,900 deposit. There were then, instead of the single account of Peter Bollack, to which was credited $32,900, six accounts, one for $6,000, and one for $2,900, credited in the form stated above to Peter Bollack in trust for himself and Eva, and four for $6,000 each, and each credited in the same form to Peter Bollack in trust for himself and successively one of the other four children.

Following Peter Bollack's death in 1934, the three children of Peter Bollack, Jr., brought this suit against the five surviving children of Peter Bollack, against his administrators, and against the Canton National Bank (1) to enjoin the withdrawal of the funds credited to these several accounts, (2) to enjoin the transfer or other

disposition of any pass-books issued by the bank, or of any securities in a safe deposit box of Peter Bollack, and (3) to have the funds credited to these several accounts, and any securities found in the safe deposit box, declared to be the property of the estate of Peter Bollack. The grounds given for that relief were (a) that at the time the six accounts were opened Peter Bollack was mentally incapable of executing a valid deed or contract, and (b) that he was coerced and unduly influenced to open the five accounts, each of which was in the form stated above for the benefit of one of his five children then living. The bank answered separately, disclaimed any interest in the controversy other than that of a depositary, and announced its intention to await and abide by the court's decision. The other defendants filed a joint answer denying the allegations of undue influence and want of mental capacity, admitting the allegations of pedigree and history, and calling for proof of certain other allegations. At the hearing on those issues, at the conclusion of the plaintiffs' evidence, the court announced that it would dismiss the bill, which was accordingly done. The appeal is from that decree. The questions which it submits are whether, conceding the truth of the plaintiffs' evidence, it is sufficient to show (1) that Peter Bollack did not create "a trust fund" for each of his five children, (2) if he did, were his acts the result of undue influence exercised and practiced upon him by those defendants. The issue of a want of mental capacity to create the several trust funds was abandoned at the trial and need not be considered.

Considering these questions in inverse order, the natural and ordinary presumption is, that where one in the full possession of his mental faculties executes a deed, will, or other instrument, conferring a benefit upon another, by affixing his signature thereto, that his act is free, intentional, and voluntary. *Devlin on Deeds,* sec. 84; *Jones on Evidence,* sec. 191. But the presumption is rebuttable, and has no application where a beneficiary under the instrument stands in a confidential relation to

the donor. Except where the nature and consequences of the provisions ·of the instrument itself, or the relationship of the parties and beneficiaries, furnish some proof of undue influence, the burden of showing that it was the result of such influence is upon the person alleging that fact. *Id.; Birchett v. Smith,* 150 Md. 369, 379, 133 A. 117. There is no such proof in this case.

Peter Bollack appears from the evidence to have been a man not easily influenced. Life had apparently taught him the value of thrift, he permitted the children with whom he lived to eke out a scanty existence, wanting not only the comforts, but at times doubtful of having even the necessities of life, when he had over $30,000 in cash to his credit in the bank, without giving them help they sorely needed. But while hard, in a sense, he was withal not an unkindly man. In the later years of his life he saw little of the children of his son Peter. That son was divorced from his wife in 1914, and after that his children lived with their mother, who remarried, and he lived with his father until the last two years of his life, when he lived alone. He was an invalid for fifteen or seventeen years immediately before his death, and he died at the age of fifty-two. He was on friendly terms with his father, who "took his death very hard." After the divorce, Peter Bollack, Jr's. children saw their grandfather quite often for a time, but in later years they visited him infrequently, although their relations continued to be friendly. The attitude of their uncles and aunts towards them in the last years of their grandfather's life was cold and unfriendly.

The relations of the Bollack family were in that state when on June 20th, 1933, Peter Bollack and his five children appeared at the Canton National Bank for the purpose of dividing in the manner described above the fund which Peter had on deposit there. Joseph L. Leitzer, auditor of the bank, who actually attended to the details of the transaction, attempted to describe the occasion, to tell what actually occurred, but not unnaturally, after the lapse of so long a time, his evidence was vague and un-

satisfactory. Reduced to its essential facts, it amounts to this: Mr. Bollack and his five children appeared at the bank together, they had some conversation with a Mr. Bramble, its vice-president, and he took them to Leitzer, and instructed him to open the accounts in such a manner that Peter Bollack would have "control of it during his lifetime * * * ." Leitzer then took them to the "board room" and prepared the signature cards and passbooks. At that time, "all of them were talking," but the record fails to show that Peter Bollack said anything at any time directly to Leitzer to his definite recollection. He said "there was a general conversation—the purpose of coming to the bank was to arrange the accounts so that Mr. Peter Bollack would have control, and at his death it would go to his children," "the general idea was that he came to the bank to fix these accounts in the same manner we fix all accounts of that kind." Peter Bollack himself, so far as the witness knew, gave him no instructions as to what he was to do, but in preparing the entries he carried out the instructions given by Bramble, but it does not appear who instructed Bramble. Leitzer, however, after he had prepared the signature cards, explained to Peter Bollack "that we were opening this account in such a manner that he would have control of it during his lifetime, and at his death it would go to the children, and he assented to that." He did not explain to him the meaning of the words used in the formula such as "joint owners" and "trust," he did not know whether Mr. Bollack could read, and he assumed that he assented, he thought that Bollack understood him, he "presumed" that he understood him, he "considered" that he understood him, he did not know whether he expressed his assent by saying "Yes" or by nodding his head. He did, however, after Leitzer had explained to him the meaning, purpose, and effect of the several signature cards, sign them, and while on some of the cards his signature indicates feebleness, nervousness, or both, on others it was for one of his age and education quite firm and legible.

This evidence is obviously inadequate to furnish any

objective proof of Mr. Bollack's state of mind on that occasion other than this, that he, after a truthful and accurate explanation of the purpose and meaning of the legend on the signature cards, did in fact actually sign them. That is the controlling and sufficient fact. For if he was mentally competent, and that is not disputed, it must be inferred that he understood the clearly expressed and accurate explanation of the effect his signature would have, and that explanation was given to him before he signed the cards. There was evidence that his hearing was slightly affected, but he talked with his children, took part in the general conservation, and when the explanation was given by the witness, Mr. Bollack was sitting "right next" to him, and in the witness' mind there was "no question but that he heard" the explanation, and it may certainly be inferred that if he had not heard what the witness said Bollack would have asked him to repeat it.

Some point too was made of the fact that the evidence did not interpret *seriatim* the significance of each word used in the formula. That was not only unnecessary, but would probably have been more confusing than instructive. He did explain that the effect of the formula as a whole was to leave the control of the several funds in Mr. Bollack during his life, and that at his death they would go respectively to the children whose names appeared on the several cards, and that undoubtedly was what Bollack was interested in knowing, and that was the effect of the formula, for when Bollack was told that he would have control of the fund during his life, he must have understood that only the unused portion of the fund, and not the whole fund, would go to the children at his death. He was interested not so much in the legal machinery used to effect that result, as he was in knowing that whatever machinery was used it would accomplish that particular purpose. It must therefore be inferred from that evidence that when Peter Bollack executed the signature cards he understood the nature, meaning, and consequences of his acts and intended to give them effect.

The burden of proving undue influence was on the appellant. The conduct and statements of those present at the conference at the Canton National Bank at that time, standing alone, permit no possible inference that what Peter Bollack did at that time was not done freely and voluntarily, nor is there anything in the relations and conduct of the parties prior to that time which permits any such inference. On the contrary, such evidence as there is indicates that the children who are supposed to have exerted the influence were powerless to guide or control their father's conduct. They had apparently without success suggested that he buy a home for his daughters, the two daughters, who appear to have been in very straitened circumstances, complained that he gave them little help in securing even the most inexpensive household conveniences and comforts, and it does not appear that the sons either had, or attempted to exercise, any influence of any kind over him. There is no suggestion that any of the children attempted to prejudice him against the appellants, nor is there anything in the fact that he failed to provide for them sufficient to justify the inference that such failure was due to any influence other than his own impulses. He is said to have expressed an intention of providing for their father, Peter Bollack, Jr., if he survived him, Peter Bollack, Sr., but there is no evidence that he had expressed any such intention with respect to the appellants, Peter Bollack, Jr.'s children. There was nothing so unnatural in that as to justify an inference that it was the result of improper influence. Peter Bollack, Jr., was an invalid for many years before his death, and it was natural that his father should want to see that he was protected against want, but when it came to the ultimate division of his estate, the fact that he preferred his children to his grandchildren was not wholly unnatural, in view of the facts that the division was made after the death of Peter Bollack, Jr., that he had not seen much of these grandchildren for years before that, and that as a result of the divorce Peter Bollack, Jr.'s children had been awarded to the mother and

lived with her, while their father lived with his father, the donor.

The second question is whether Peter Bollack, Sr., did in fact, by executing the several signature cards, create trust funds in favor of his five children, who are appellees in this case.

Unexplained, the entry itself is a sufficient declaration of a revocable trust *(Milholland v. Whalen,* 89 Md. 212. 216, 43 A. 43, 44; *Stone v. Nat. City Bank,* 126 Md. 231, 94 A. 657; *Restatement of Law of Trusts,* A.L.I., sec. 89), because it indicates an intention to create such a trust. That is to say, the signature cards were themselves evidence of such an intention, but it may be rebutted by proof that in signing them the donor had no such intention. *Id.* Until such proof appears, the intention manifested by the cards must prevail.

Two leading cases in which this question has been considered by this court are *Whalen v. Milholland,* 89 Md. 199, 43 A. 45, and *Milholland v. Whalen, supra.* In the first case, the owner of money deposited it to his and another's credit as joint owners, payable to the order of either or the survivor. In determining the effect of that language, the court considered only whether it constituted a gift, and not whether it created a trust, but in the second case, where the deposit was made by the donor in her name "in trust" for herself and another as joint owners, subject to the order of either, the balance to belong to the survivor at the death of either, it considered two questions, one, whether there had been a gift or transfer of the fund, and, if so, whether the fund so transferred was impressed with a trust. In the first case, it reached the conclusion that there was no completed gift, because there was no immediate transfer of the fund to an existing donee, since the donor retained absolute and complete control over it. But in the second case it was held that the declaration of trust operated to immediately transfer the legal interest in the fund to the trustees named, even though, as in that case, the donor was also the trustee, and it was said that the validity of

the trust depended "wholly upon the intention of the depositor, and an apt declaration of the trust." It was also stated that "it is the donor's act which originates the trust, and it is the intention with which he does the act that is material." The rule stated in *Milholland v. Whalen, supra,* has been repeatedly approved in this court (*Ghingher v. Fanseen,* 166 Md. 519, 529, 172 A. 75, and cases there cited), and is consistent with this statement of it in the *Restatement of Law of Trusts,* sec. 58: "Where a person makes a deposit in a savings account in a bank in his own name as trustee for another person intending to reserve a power to withdraw the whole or any part of the deposit at any time during his life time and to use as his own whatever he may withdraw, or otherwise to revoke the trust, the intended trust is enforceable by the beneficiary upon the death of the depositor as to any part remaining on deposit on his death if he has not revoked the trust." In a comment to that section, the Institute adds: "In the absence of evidence of a different intention of the depositor, the mere fact that a deposit is made in a savings bank in the name of the depositor 'as trustee' for another person is sufficient to show an intention to create a revocable trust."

*Littig v. Mt. Calvary Protestant Episcopal Church,* 101 Md. 494, 61 A. 635; *Stone v. National City Bank, supra; Reil v. Wempe,* 145 Md. 448, 125 A. 738; *Gimbel v. Gimbel,* 148 Md. 182, 128 A. 891, emphasize the rule that where the terms of the deposit create a valid trust, and it appears that the donor has either executed, or expressly assented to them, in the absence of any showing that the donee stood in a confidential relation to the donor, the burden is upon one alleging that it was not the intention of the donor to create a trust to prove that fact.

For reasons which it is unnecessary to repeat, the appellants in this case failed to meet that burden. Apart from vague suspicions, based upon the hostility of their uncles and aunts to the children of their deceased brother, there is literally nothing in the record to show that the declaration on the several signature cards did not ex-

press the fixed and deliberate intention of the donor. It is true that the five children must have known, when they accompanied their father to the bank, why he went there, but in the absence of any evidence to indicate that they molded his purpose, or influenced his acts, it cannot be assumed that because they knew what he intended to do, that what he did expressed their intention but not his. On the contrary, their presence there would rather indicate that what he did was to carry out a plan of which he had informed them before their visit to the bank. He knew the number of his children, he knew the amount of his deposit, he knew the amount deposited in each of the five trusts, and he knew the balance remaining after the subtraction of those amounts from the original deposit, and that amount he reserved for current expenses, for, to quote Leitzer, "The old gentleman said they would use that account to withdraw funds from time to time for expenses." He must therefore have known that that division left nothing for the children of Peter, his son, and he must have intended to exclude them. He was told the effect of the legend on the signature cards, it was read to him, explained to him, and he had the cards on which it appeared before him when he signed them. It does not appear that he had ever expressed any intention different from that indicated on the cards, or that he had ever intended any other division of his estate than that which they effected. Under such circumstances, mere suspicion based upon nothing more tangible than the fact that the five children were unfriendly to the appellants is not sufficient to strike down what appears from all the evidence to have been deliberate and intentional acts of the donor, done openly, and in the manner in which such transactions are ordinarily and usually carried out.

In the course of the trial, exceptions were noted by appellants to rulings upon questions of evidence, but since they were not mentioned in the oral or written arguments in this court, they will be regarded as abandoned, and need not be discussed further than to say that, in

418

reaching the conclusion announced in this opinion, the evidence affected by the exceptions has not been considered.

It follows from what has been said that the decree appealed from must be affirmed.

*Decree affirmed, with costs.*