LEO J. DOUGHERTY *v.* FRANCIS P. DOUGHERTY,
**ET AL.**
[No. 48, October Term, 1938.]

*Decided November 16th, 1938.*

The cause was argued before Bond, C. J., Urner, Offutt, Parke, Sloan, Mitchell, Shehan, and Johnson, JJ.

*Randolph Barton, Jr.*, and *Leo J. Dougherty*, for the appellant.

*William L. All* and *Harry N. Baetjer*, for the appellees.

Offutt, J., delivered the opinion of the Court.

Leo J. Dougherty, the appellant, and Francis P. Dougherty, one of the appellees, are the sons of Patrick Dougherty, who died on April 10th, 1916. Patrick Dougherty in 1895 organized the P. Dougherty Company of Baltimore County, a corporation, the other appellee, which since that time has been engaged in the business of building tugs and barges, towing and transportation, buying and selling vessels, and the operation of vessels inland and coastwise. Patrick Dougherty's wife was a sister of Thomas F. McHugh, who had been associated in the business with Patrick Dougherty before the formation of the corporation, perhaps as early as 1888. The capital stock of the corporation was divided into 5,100 shares, of which Patrick Dougherty and McHugh each owned 2,550 shares. At his death Dougherty's shares passed to his family, but McHugh held his stock until February 27th, 1926, when he endorsed certificates, transferring 1,250 shares to Francis and 1,250 shares to Leo, and had the transfers entered on the company's books, but retained the certificates until his death on January 10th, 1936. At that time an additional certificate transferring his remaining fifty shares to Leo was found. In addition to those shares Francis and Leo own a part of their father's share of capital stock of the company, so that at present Leo holds 1,937 shares and Francis 1,887 shares. Of the

remaining 1,276 shares, 638 are held in trust for P. Francis (not Francis P.) Dougherty, and the remaining shares by other members of the McHugh and Dougherty families. Upon the death of Patrick Dougherty, Thomas F. McHugh became president and treasurer of the company, Leo its secretary, and Francis its assistant secretary, offices which they retained until the death of McHugh, when Francis became president and treasurer, and Leo vice-president and secretary.

McHugh was twice married. His first wife died January 24th, 1920. He remarried in 1925, and the second wife died March 23rd, 1933. There were no children of either marriage, and perhaps because of that his relations with his two nephews, Leo and Francis, were unusually intimate, pleasant, and affectionate.

Both he and Patrick Dougherty seem to have been men of outstanding force and sound business judgment, and the company appears to have been successful during their association, but its greatest period of prosperity came during and for a short time after the closing years of the world war, when for a time McHugh and Mrs. Dougherty, the widow of Patrick, each received $2,000 a week in salaries. McHugh left an estate of about $500,000, most of which came in one way or another from the P. Dougherty Company. Because it represented the greater part of his life's work, because throughout its history it continued to be the exclusive property of his own and the Dougherty family, and because his fortune was founded on it, McHugh until his death, took a deep interest in its affairs, although even before 1918 he had considered severing his connection with it, and in 1926 he endorsed certificates transferring his stock to his nephews, and had the transfers entered on the books of the company, although he retained the certificates in his possession. Nevertheless he held the office of president and treasurer until his death, and in every crisis or need of the company he was ready to lend money to aid it. These advances, while enuring to the immediate benefit of the company, were not infre-

quently entered on its books as credits to his nephews, and in 1928 he advanced as a gift $55,000 to each of his nephews, Leo and Francis, upon the understanding that they should apply the money to liquidating a loan of $110,000 by the Mercantile Trust Company to the company, each to be credited on the books of the company with a loan of $55,000 to it. These advances to or for the company were, except as to the $110,000, drawn from a checking account which McHugh kept with the Mercantile Trust Company, in which at his death there was a balance of approximately $42,000. In September, 1924, he had that account put in his name as trustee for himself and Leo as joint owners, subject to the order of either, balance if any at the death of either, to go to the survivor, and so it remained until October 2nd, 1933, when he substituted the name of Francis P. Dougherty for that of Leo. After the death of Thomas F. McHugh, Francis P. Dougherty succeeded to the balance as survivor, and voluntarily had the account changed so as to read "F. P. Dougherty, Trustee, in trust for himself and Leo J. Dougherty, joint owners, subject to the order of either, balance at the death of either to belong to the survivor." During McHugh's life, only he drew checks against the account, and after his death only Francis P. Dougherty drew against it. After it was transferred to Francis in trust for himself and Leo as joint tenants, Francis drew against it for loans to the company and for the purchase of certain stock, which Leo suggests was bought for the company, but which Francis says he bought for himself.

Some months after Francis had opened the trust account for himself and Leo as joint tenants, he withdrew the name of Leo therefrom, and substituted therefor the name of Margaret F. Dougherty, the wife of Francis. When he learned of the change, Leo sought an explanation from Francis and, to quote from his testimony: "I brought up about this account, and asked Frank what he was going to do about it, and he said it was his, and I asked him to divide it with me. Frank

claimed and said it was his, and of course I just felt different, and I thought if Seymour O'Brien advised me —I took it up with Mr. O'Brien, and he said, 'I think if you talk with your brother he will divide with you,' and on that suggestion that caused me to do it. That was the first conversation when I was informed that it was all his, or he told me it was his." That interview is said to have occurred in the third or fourth week of July, 1936, and the bill in this case was filed in the following May. The bill was filed by Leo against Francis P. Dougherty, his brother, and the P. Dougherty Company. In it, after reciting in substance the facts stated *supra*, he prayed this relief:

"(a) That a decree may be passed declaring the amount on deposit in the aforesaid Mercantile Trust Company of Baltimore at the time of the death of the said Thomas F. McHugh to have passed to the Defendant, Francis P. Dougherty, in trust and for the use of said The P. Dougherty Company of Baltimore County.

"(b) That said Francis P. Dougherty may be required to account for and pay over to said The P. Dougherty Company of Baltimore County all said amount so on deposit at the time of said death of said Thomas F. McHugh.

"(c) And that your Orator may have such other and further relief as his case may require."

The defendants answered, and in their answer denied that the fund of $42,000 deposited with the Mercantile Trust Company in the name of Thomas F. McHugh, Trustee for himself and Francis P. Dougherty, as joint tenants, was impressed with a trust for the P. Dougherty Company of Baltimore County. The case was tried upon that issue, and at the conclusion of the trial the court dismissed the bill. From that decree the plaintiff, Leo J. Dougherty, appealed.

The case is essentially one of fact. The legal principles applicable to the facts are well established, and not seriously questioned by either party. Obviously if the settlor, the trustee, and the *cestuis que trust* intended

and agreed that the survivor should hold the balance of the fund in trust, that fact may not only be shown but should be given effect. *A. L. I., Restatement of Trusts,* par. 24, illus. 4, par. 58, comment a; *Wetzel v. Collin,* 170 Md. 383, 387, 185 A. 117; *Bollack v. Bollack,* 169 Md. 407, 182 A. 317; *Tillinghast v. Lamp,* 168 Md. 34, 176 A. 629; *Milholland v. Whalen,* 89 Md. 212, 43 A. 43; *Ghingher v. Fanseen,* 166 Md. 519, 172 A. 75. On the other hand it is equally established that where an account is entered to one in trust for himself and another, as joint tenants, subject to the order of either, balance if any at the death of either to belong to the survivor, a presumption instantly arises that, upon the death of one of the tenants, the survivor takes title to any balance remaining in the fund, and the burden is upon any third person, who alleges that a different result was intended by the settlor, to prove that fact. *Ibid.*

The appellant's contention is that the settlor intended that the survivor should secure possession of the balance, but that, having secured possession of it, he should hold it in trust for the P. Dougherty Company of Baltimore County. In other words, he alleges that the settlor intended to create a definite trust as to the balance, to arise after the termination of the trust created by the entry.

An indispensable element of a valid trust is certainty, certainty as to the subject matter upon which it is to operate, certainty as to the object to which the subject matter is to be dedicated, or, as stated by Judge Digges for this court in *Sieling v. Sieling,* 151 Md. 536, 549, 135 A. 376, 381; "Generally speaking, in order to create a valid trust three circumstances must concur: First, a definite subject matter within the disposition of the settlor; second, a lawful, definite, object to which the subject matter is to be devoted; third, clear and unequivocal words or acts devoting the subject matter to the object of the trust." To establish a trust by parol "the trust must be clear and the evidence of it convincing". *Pope v. Safe Dep. & Tr. Co.,* 163 Md. 239,

249, 161 A. 404, 408; 65 *C. J., Trusts,* par. 47. The general rule in respect to the burden assumed by one who alleges the existence of a trust is thus stated in 26 *R. C. L.* 1203: "Whether a trust has been perfectly created is largely a question of fact in each case, and the court, in determining the fact, will give effect to the situation and relation of the parties, the nature and situation of the property, and the purposes or objects which the settlor had in view. The burden of proving the existence of a trust rests on the person asserting it, and he must prove it by clear and satisfactory evidence having in view all the surrounding facts and circumstances and the intention of the parties. The same degree of proof should be required to prove an express trust as to establish a resulting trust, and the naked oath of one witness, without other corroborating circumstances proved, ought never to be held as sufficient." See also *Gimbel v. Gimbel,* 148 Md. 182, 128 A. 891. In this case, the appellant concedes, as he must, that to secure the relief for which he asks he must prove (1) that the settlor intended that the balance should not be taken by the survivor for his own proper and personal use, and (2) that he intended that the survivor should hold it in trust for the P. Dougherty Company, for that is the specific relief for which he prays.

So that the purpose of any analysis of the evidence must be to discover (1) whether the settlor intended that the appellee, if he survived the settlor, should come into the possession of the fund, and (2) that if he did so come into possession of it that he should hold it not for himself but in trust for the use and benefit of the P. Dougherty Company. Appellant, in support of his contention that the settlor so did intend, relies (1) upon the long continued course of dealing between McHugh and the company, (2) upon the conduct of the appellee subsequent to McHugh's death, and (3) upon McHugh's declarations.

Without attempting to recite it in detail, it is sufficient

to say that in addition to those recited above, the evidence does establish facts which may be thus stated.

After the peak of its prosperity during the war years and immediately thereafter, the business of the P. Dougherty Company began to recede, and that recession continued until its profits disappeared entirely and it was operated at a loss. In those lean years, Thomas F. McHugh loaned it the support of his name, of his credit, and of his money. He acted as its president, he indorsed its notes, and he made loans to it. From 1932 until his death he advanced to the company by way of loans over $39,000, of which $7,900 was advanced after the name of Francis had been substituted for that of Leo as a joint tenant of the checking account in the Mercantile Trust Company. But those advances appear to have been loans rather than gifts, for while the evidence shows that McHugh was always willing to lend the company money, there is no evidence that he ever gave it any. When he did make such advances, the money was invariably drawn from the particular checking account under consideration here, but it also appears that that account was quite active, and that he drew upon it not only for that purpose but for his own personal needs, such as living expenses, charitable contributions, and contributions for church and educational purposes, so that, of one lot of five hundred and fifty checks against that account, only seven, aggregating some $8,594.12, were for advances or loans to the company, and when such advances were made they were credited to McHugh as loans. In 1921 the company had bought a number of barges, and had borrowed $400,000 to pay for them, and had given its note to the Mercantile Trust Company for that amount. In 1928 the amount due on the note had been reduced to $110,000. McHugh, although he had transferred his stock in the company to his nephews, wanted that loan paid off. He therefore advanced to each of them as a gift $55,000, upon the understanding that they would use the money to pay off the note. They did so use it, and the company gave each

of them its note for $55,000. As a result of these and other credits, on August 19th, 1936, the company was indebted to Francis P. Dougherty for $66,000 and to Leo J. Dougherty for $66,000, much of which was barred by limitations, and on that day it gave each of them notes covering that indebtedness. At the time those notes were given, the company owed another creditor $40,000, a debt which it was apparently unable to pay from its current liquid assets. The last check drawn against the account by McHugh was on January 9th, 1936, for $5,000, which he loaned to the company, and which was entered as a loan to it by him.

After the death of Thomas F. McHugh, and after Francis P. Dougherty had transferred the account to his name as trustee for himself and Leo as joint tenants, he bought one hundred shares of the preferred 4½ per cent. stock of the Commercial Credit Company, and paid for it from that account. The stock was registered in the name of Robert Garrett & Son, the brokers, as a "street name." After that, in connection with the conversion of that stock into common stock, and the payment of dividends, a number of letters were exchanged between the broker and the company. In that correspondence Francis Dougherty signed the company's name to letters stating that "We are the holders * * * of the common stock" into which the preferred stock had been converted, and requesting the broker to "send us" the dividends, and he did in fact receive the dividends and turned over at least one of them to the company.

George E. Kelley, the salesman who represented the broker in the transaction, said that he sold the stock to Francis, that the original bills were made out to him, and that they were registered in a "street name" to avoid having them listed as Francis' property for purposes of taxation. Later Francis had the stock registered in his own name, and claimed it as his personal property. When asked why he sent out a letter signed for the company stating that "We hold," *etc.* the Commercial Credit Company stock, he said that he did not

know why he had done it. He said, however, that the stock was bought for himself personally, and William H. Powell, the company's bookkeeper, and a director, testified as to it: "Frank came to me and said, 'I am buying one hundred shares of Commercial Credit preferred, and I purpose giving the dividends to the company.' Later on—that was the day he purchased it. Later on he said, 'I am putting this stock in the street name of Robert Garrett and Sons.' I said, 'Frank, if you are going to give the dividends to the P. Dougherty Company, you better have the dividend checks made out in the name of the company, because if you have them made in your personal name you will have to pay an income tax on them, and you won't get any credit for it.' So he arranged that way, to have the dividend check made out directly to the P. Dougherty Company. And the first dividend check, which was September 30th, 1936, I think, was turned over to the company and put on the company's books. That was the only check the company received." Later Francis testified that when he said "we" in the company's letter to the broker he used "we" "figuratively" because he wanted "the stuff to come to the office," and in fact the stock never was entered by the company on its books as its property.

The company owned certain securities, and, after McHugh's death, Leo asked Francis to divide these securities between them, and have them applied to a reduction of their loans to the company, but Francis would not agree.

Leo was also permitted to testify that while his name was still on the entry as a joint tenant of the account, his uncle, Thomas F. McHugh, said to him that the account was "to go" to his brother and himself, "to keep the name of Patrick Dougherty good through the P. Dougherty Company," and that he made similar declarations after the name of Francis was substituted for that of Leo in the account.

McHugh made three wills. In the first, dated July 5th, 1929, he bequeathed $20,000 each to Leo and Francis,

and to each one-tenth of his residuary estate. In the next, executed in 1933, he bequeathed $20,000 to Francis and $15,000 to Leo, and to Francis one-fifteenth of his residuary estate and to Leo one-thirtieth, and in his last will he left Francis $15,000 and Leo $10,000, and gave Francis one-fifteenth of his residuary estate and Leo one-thirtieth. In his first will he appointed Leo and Francis joint executors, and in the second and third wills he substituted the Maryland Trust Company for Leo.

McHugh had joint trust bank accounts other than that in issue here, but he had one account in another bank for $10,000 in his own name. When it became known that he was critically ill, Leo suggested to Francis that he see their uncle and have him change that account to a joint account in the names of Francis and Thomas F. McHugh. Francis said that Leo told him of the account, and suggested that he see what their uncle wanted to do about it, and learn whether he wanted it changed to a joint account, but that he found him too ill to discuss the matter at all.

It also appeared that Leo had requested the company to enforce its supposed claim against Francis, but that it refused to do so, and that because of its refusal he himself brought this suit.

Those facts, and they are in substance all the material facts appearing in the record favorable to appellant, are wholly insufficient to fasten upon the fund, which Francis P. Dougherty acquired at the death of McHugh as the surviving joint tenant of the checking account of the Mercantile Trust Company, a trust in favor of the P. Dougherty Company. There is not the slightest evidence that McHugh ever intended to dedicate $42,000 of his fortune to keep alive a mere business corporation, which to his knowledge had been in a failing condition for years, in which he had declared he had no further interest, and of which he himself was a large creditor. Nor is there to be found either in the evidence or in the pleadings any description of such a trust nor any allega-

tion or proof of the essential elements of any valid and enforceable trust. The appellant does state that the settlor intended that if Francis survived him he should hold the balance of the fund in trust for the use of the P. Dougherty Company. But quite apart from the improbability that so sane and capable a business man as McHugh intended to devote such a large fund to the use of a bloodless, insentient, impersonal organization, a mere legal abstraction utilized only as a method of operating a business, it is not shown how long the supposed trust is to continue, how it is to be administered, who is to take the fund in the event that the corporation should fail or be dissolved, or precisely what its object or purpose is.

Moreover the proof does not show that McHugh intended to fasten on the fund a trust of any kind for the benefit of the company. For while McHugh in his lifetime made many gifts to his nephews, Francis and Leo, he made none to the company. When he advanced money for its use, the advance was made as a loan, not as a gift, and obviously made to benefit them, because they held so much of its capital stock. It is quite unlikely that if strangers rather than members of his and the Dougherty family had held its stock, that he would have made the advances at all.

In support of the theory that he did intend to create such a trust the appellant relies (1) upon Leo's testimony as to certain loose and indefinite statements supposed to have been made by McHugh to Leo when he, Leo, was one of the joint tenants of the account, as well as after Francis succeeded him, (2) upon McHugh's conduct in dealing with the company, and (3) upon certain acts of Francis done after McHugh's death, as an admission of the supposed trust.

Assuming, without so deciding, that McHugh's statements, made while Leo was a joint tenant of the fund, were relevant, and that statements to Leo out of the presence of Francis, after Francis became a joint tenant, were admissible, that testimony is without weight for

454

several reasons, (1) because as to the statements made while Francis was a joint tenant, Leo's testimony is uncorroborated, and is contradicted by Francis, (2) the statements are too indefinite and inconclusive to support an inference that McHugh intended to create a trust. In substance all of Leo's testimony as to them is found in these extracts, which illustrate that conclusion:

"Originally he said, in the event of his death, although you were the survivor, it was to be divided between you and Francis? A. Yes. Q. I want to know whether after that he made any change or stated anything else that was to be done on your and his death? A. Yes. Q. What was to be done? A. To keep the name of Patrick Dougherty good through the P. Dougherty Company. Q. You mean he merely said to keep the name of Patrick Dougherty good? Did he say anything about the company? A. The company was in more or less bad shape, not earning the money, and in my presence and in the presence of quite a number of others who have now died— there was a picture on the wall, and he said to us many times—'Everything I have I owe to that man up there'— the picture on the wall of Patrick Dougherty. Q. After the account was transferred to the name of your brother —I am not asking you now about whether your uncle or brother ever told you what was said or done, but did your uncle at any time after that allude to this account, or make any reference to it, and say what the purpose of it was? A. Yes. Q. About how long after it was taken off of your name? A. The best of my recollection it was the same month in which the account was changed. Q. What did your uncle then tell you? A. Similarly like before, that it was for the benefit and use of the P. Dougherty Company for paying their bills, etc."

Leo's own conduct was in irreconcilable conflict with his contention that McHugh intended to create a trust, because after McHugh's death he proposed to Francis not only that they divide the fund between them, but that they also divide between them certain valuable securities which were a part of the assets of the com-

pany, and, after McHugh's death, Leo asked for the company's note for $66,000 to cover credits which may have been barred by limitations. He explained those acts by asserting that if he had secured part of the funds and securities he would have used them to aid the company,—if it needed aid, but whatever his motive may have been, the funds would have been in his pocket to use as he would, and he did whatever could have been done to strengthen his position in any conflict between his interests and those of any creditors which the company may have had. And his demand for absolute possession of half of the funds, and half of the company's securities, demonstrates that he at least did not believe that McHugh intended to impress the fund with a trust, for it cannot be assumed that he intended to conspire with the trustee to have the latter commit a breach of the trust.

Nor can any inference favorable to the theory of a trust be drawn from the fact that Francis voluntarily entered the name of Leo as a joint tenant of the fund. Between them, he and Leo owned about three-fourths of the company's stock, they were the executive officers who managed it, and it was no doubt convenient to have a fund available in that form to meet emergencies should they arise, and it was so used. But nothing was said by either of them to indicate that it was a trust fund, but on the other hand Francis said that he put Leo's name in the account as a joint tenant as a matter of grace, because their uncle had dealt so generously with him, that is, with Francis. Whether or not the entry could be construed as an admission that Leo had an interest in the fund, it certainly was not an admission that the company had any interest in it. McHugh had used the deposit as a general checking account for all purposes, and when he advanced money for the company's use, the advancement did not help the company, but merely substituted one creditor for another, but it did help his nephews, for the loans were not infrequently credited to them.

Nor is appellant's contention helped by the transaction in which part of the fund was used to buy Commercial Credit Company's stock. Powell, the bookkeeper, testified that Francis had told him that he intended to buy the stock, but that he intended to give the dividends to the company, and that he, Powell, advised him to have the dividend checks made payable to the company. Francis testified that he intended to give the dividends to the company because "the company was not making enough money to keep it alive, so after my uncle died some one had to furnish some funds for it to keep on going, so while I was making this investment I thought I would give them this money so they could use it when it came due." When the stock was bought, it was billed to him, and he afterwards had it transferred to him personally. In his correspondence with the broker he did refer to the stock as company property, but it was not so entered on the company's books, and when asked why he so referred to it, he said, "I don't know why I should have done it, I guess it was foolish thing on my part to have done it," and later he added that it was to "keep him straight" with his certificates, since he also held other stock of the Commercial Credit Company. It is neither alleged nor shown that he intended to give the stock to the company, although appellant so contends. But whether it was or was not a gift, the transaction affords no proof of a trust, in the absence of evidence to show what the trust was, and whether it was a gift is not in issue in this suit, which is brought not to recover property or to enforce a gift, but to have the court declare and enforce a trust.

Without further prolonging the opinion, it is enough to say that the evidence is not sufficient to meet the burden assumed by the appellant, that he is not therefore entitled to the relief prayed, and that his bill was properly dismissed. It follows that the decree from which the appeal was taken must be affirmed.

*Decree affirmed, with costs.*