KNOWLES ET AL. *v.* BINFORD ET AL.

[No. 69, September Term, 1972.]

*Decided January 18, 1973.*

The cause was argued before McWILLIAMS, SMITH and DIGGES, JJ., and RICHARD P. GILBERT, Associate Judge of the Court of Special Appeals and WILLIAM B. BOWIE, Associate Judge of the Seventh Judicial Circuit, specially assigned.

*Carlyle Barton, Jr.,* with whom was *Edgar H. Gans* on the brief, for appellants.

*William F. Mosner,* with whom were *Power & Mosner* on the brief, for appellees.

BOWIE, J., delivered the opinion of the Court.

Appellees Lea Warner Binford (Lea) and Julia Muse Conquest (Julia) filed suit below in the Circuit Court for Baltimore County, Judge Walter R. Haile presiding, for the purpose of having the second amendment of their late aunt's deed of trust declared invalid, alternatively on numerous grounds including mental incompetency

**4**

and undue influence. The court, sitting in equity, concluded, after a hearing in open court, that the challenged amendment was procured through undue influence by either or both of the appellants, and was void and of no effect, excepting several purely administrative paragraphs which were ratified and confirmed. Appellants, Florence C. Knowles and her nephew Robert Alexander, have appealed seeking to have this Court reverse the circuit court on the ground that it was clearly in error. After review of the record, we think the court was not clearly in error and should, therefore, be affirmed.

Appellants have attacked Judge Haile's rulings at three stages of the hearing: first, his denial of appellants' (defendants below) motion to dismiss at the end of appellees' (plaintiffs below) case; second, his denial of the motion to dismiss at the end of the defendants' case; and third, the court's final determination of the existence of undue influence.

We believe that appellants' assignments of error for the denial of the motions are without substantial basis. Without going into detail at this juncture, there was more than sufficient evidence to sustain Judge Haile's rulings, *Clark v. Stansbury,* 49 Md. 346, 352 (1878).

The crux of appellants' argument is that a finding of undue influence was not justified in light of the law and facts as presented.

The law as regards a claim of undue influence was succinctly stated by Judge Hammond in *Stockslager v. Hartle,* 200 Md. 544, 547, 92 A. 2d 363 (1952) when he wrote for the Court:

> "The standards described by the law for the testing of whether or not a will has been procured by undue influence were set forth by this Court recently in the case of *Koppal v. Soules,* 189 Md. 346, 56 A. 2d 48. In that case, the Court said that undue influence which will avoid a will must be unlawful on account of the manner and motive of its exertion, and must be exerted

to such a degree as to amount to force or coercion, so that free agency of the testator is destroyed. The proof must be satisfactory that the will was obtained by this coercion (although it need not be immediately exercised as of the date of the execution of the will if its influence causes its execution) or by importunities which could not be resisted, so that the motive for the execution was tantamount to force or fear. Mere suspicion that a will has been procured by undue influence, or that a person had the 'power unduly to overbear the will of the testator' is not enough. It must appear that the power was actually exercised, and that its exercise produced the will. The burden of proof is on the caveator to meet these requirements of the law."

Mabel Warner (Mabel) was the unmarried aunt of the appellee sisters, Lea and Julia. From about the age of six until her death at 82, Mabel was an intimate friend of appellant Florence Knowles (Florence), who had never married. Appellant Robert Alexander (Robert), Florence's favorite nephew, had known Mabel for many years. Mabel died in September 1970. At that time, Mabel's deed of trust, as amended by a second amendment provided that the income from virtually the entire trust estate should be paid to Florence for life, with remainder to Robert upon his aunt's death. Lea and Julia, because of their close family relationship with their aunt, decided that Mabel would not have excluded them from her trust estate unless she had been persuaded to do so by Florence and Robert.

Mabel was in comfortable circumstances as a result of a sizeable inheritance from her father and the apparently sound investment advice of her late brother, James Warner (James). Born and reared in Baltimore, she had habitually spent the major portion of the year in that city and her summers at Cape May, New Jersey. When

she was about 71, she moved to her friend Florence's house in the Philadelphia suburb of Wynnewood. After this move in 1960, she spent her winters in Philadelphia and her summers at Cape May. Once she left Baltimore, Mabel never returned.

So long as she lived in Baltimore, her ties with her large family, and especially with appellees were very close. About 30 years previously, Lea and Julia, on the death of their parents, had moved in with their Aunt Mabel, another aunt and their grandmother. Mabel was named Julia's legal guardian. By 1948 both nieces had moved away from the Warner home, but they continued to maintain a close relationship with Mabel.

The move to Philadelphia did not end contact with the Baltimore relatives. Mabel often was in touch with her brother James about both business and personal matters. Judith Warner, James' daughter, a niece who testified at the trial but refused to join her cousins in attacking the amendment, kept in touch with her aunt by telephone throughout the years and forwarded Mabel's monthly social security checks (together with personal notes) from Baltimore to Philadelphia. Appellees Lea and Julia maintained their contact with their aunt by telephone and correspondence. They visited Mabel, from time to time, in both Philadelphia and at Cape May.

The close relationship between Mabel and her family in Baltimore continued until the death of Mabel's brother James in early 1969, approximately 18 months before her own death. After James' death, the relationship suffered a marked decline.

From 1959 until six months after James' death, Mabel's four nieces, including the appellees, were the principal beneficiaries of their aunt's estate. In 1959, she had directed her Baltimore attorney to prepare an inter vivos revocable deed of trust by the terms of which all income was to be paid to her until death, when the income was to be paid first to her brother James for life and then to her other brother, Douglas Warner (Douglas), for his

life. Upon the death of both brothers, the trust was to terminate and the corpus was to be divided equally among her nieces and nephews.

Four years after the execution of the deed of trust, Mabel directed her Baltimore attorney to prepare a first amendment by which she excluded her nephews from participation in the trust estate. Aside from individual bequests to several persons, including $10,000.00 to Florence and a significantly smaller amount to Robert, Mabel's nieces remained principal corpus beneficiaries until October 1969, when Mabel executed a second amendment to the deed of trust, the validity of which is being challenged by Lea and Julia.

The truly decisive period is the seven months following James' death in March 1969. It began with the shock of James' death and ended with the signing of the second amendment which, for all practical purposes, excluded the nieces from sharing in Mabel's estate, substituted an outright bequest for Douglas' life estate and gave a life interest to Florence with remainder in Robert on Florence's death. During this critical period, Mabel was in poor health, a result of the infirmities of age and a heart attack which was attributed to James' death. The severity of her illness prompted her doctor to urge that a practical nurse be employed.

The nurse, Mrs. Katherine Crawford, together with Lea, Julia and their cousin Judith, testified to the situation as it was during the period March to October 1969, in the Knowles-Warner houses in Wynnewood and at Cape May. Their testimony was, for the most part, unrefuted.

(1) Mabel repeatedly pleaded with Mrs. Crawford to assist her in returning to her family in Baltimore, but Florence and Robert refused to permit such a trip, even to the extent that Mabel was physically restrained and her clothes were hidden by the nurse.

(2) Florence told Mabel that nobody in Baltimore cared about her and that her people were no good.

(3) Mabel's mail was generally censored by Florence after April of 1969, and the nurse was instructed to give all mail from the Baltimore trustee of the trust estate and from Mabel's new Philadelphia attorney to Florence, to the end that Mabel did not see these letters.

(4) Mabel was often childlike and almost totally subject to Florence's domination.

(5) Mabel confided in her nurse that she wanted the daughter of her brother James to share in her estate, but later when the trust instrument was amended, this desire was frustrated.

(6) Letters from Julia to Mabel were intercepted and destroyed by Florence.

(7) On at least a half dozen occasions, Florence and Robert refused to allow calls from the nieces to be put through to Mabel, though a telephone was located beside her bed in Philadelphia. The reason given was that she was not well enough to receive calls.

(8) Household finances were completely controlled by Florence and Mabel was utterly dependent upon her, even for incidental spending money.

(9) After the death of Douglas in the summer of 1969, Lea, her brother and his family decided to visit Mabel without prior arrangement. In view of the recent difficulties they had experienced in communicating with their aunt, they feared Florence would tell them not to come if they telephoned. Their fears were substantiated when they visited the Knowles-Warner home and were kept waiting for over an hour before being permitted to see Mabel. Even then, they did not see her alone, because Florence was present throughout this visit, as she always was during visits by Mabel's family.

(10) Mabel employed a new attorney in Philadelphia in April of 1969, who had been Florence's and Robert's attorney for several years.

(11) While family members had difficulty communicating with Mabel, the new lawyer was admitted without

difficulty. It would seem that Florence considered Mabel well enough to see her attorney but not well enough to speak to or visit with the family.

(12) In October 1969, about the time Mabel was executing the second amendment, two of her nieces made an unannounced trip to Philadelphia. They saw only Robert who told them that Mabel had retained a new lawyer to handle her affairs, and that Florence would rather they not see their aunt. They left without seeing Mabel.

(13) Several hours after Mabel had executed the second amendment, she excitedly told her nurse that she had been forced to do something that she did not want to do but asked the nurse not to tell Florence, who was sleeping at the time.

The appellants called only two witnesses, Mabel's Philadelphia attorney, John Bishop and his partner, A. C. Dorrance, Jr. Their testimony, which was principally concerned with Mabel's competence, was essentially similar and unrefuted. Bishop told of numerous visits to and conversations with Mabel in the period from April 1969 until her death in 1970. He testified that she first mentioned to him in April 1969 that she wanted to change the dispositive provisions of the deed of trust because she had decided she wanted to leave the bulk of her estate to Florence, since she no longer had any connection with Baltimore and that she wanted to change her brother Douglas' life estate to a flat sum. For tax reasons, Bishop convinced his new client to give Florence a life interest only with remainder on her death to Robert. Mabel was aware, at that time, that Florence had determined to leave her own estate to Robert. After several redrafts of what was to become the second amendment to the 1959 deed of trust, Bishop felt it was ready for signature in June 1969. When he called for an appointment at that time, he was told Mabel was not then well enough, so a date early in July was agreed upon. On that day, Bishop and Dorrance went to see Mabel and were admitted by Florence. Bishop realized that Mabel

was in poor condition and thought she was not competent to sign at that time. He advised both ladies of this conclusion and they agreed he would return when she was feeling better. Florence raised no objection whatever to Bishop's decision to postpone the signature date.

Following their usual schedule, the ladies went to Cape May for the summer and execution of the second amendment was delayed until October 1969. Before seeing Mabel in Philadelphia in early October, Bishop called Mabel's doctor to ascertain what her condition was and Bishop was led to believe that she would be capable of signing the amendment in October. He went to see Mabel on October 10th and determined, from all appearances, that she was competent. She signed on that day and later, on the 29th, acknowledged her signature before a notary. After each visit, Bishop came away convinced that Mabel was aware of the dispositive provisions of the second amendment and that the result was exactly what she wanted.

These were the facts upon which Judge Haile reached his decision that undue influence had been exerted on Mabel by Florence or Robert or both from April 1969 through October 1969, and that this undue influence amounted to coercion. The scope of this Court's review of a case tried without a jury is limited by the "clearly erroneous" rule. "[T]he judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." Maryland Rule 886.

It should be noted that neither Florence, nor Robert, nor any of the household employees were called as witnesses for the appellants, nor were they deposed, as might have been necessary in view of Florence's ill health. It would seem logical to assume that some or all of them might have shed some light on the situation, *Critzer v. Shegogue*, 236 Md. 411, 420, 204 A. 2d 180 (1964).

Appellants raise several salient points which Judge Haile no doubt considered when determining the presence of undue influence. Appellants stressed that the disposition directed by the second amendment was natural in view of the fact that the two ladies had been like sisters for more than 70 years, even to the point of sleeping in the same bed; that Florence did not insist that Mabel sign the second amendment in early July, even though Florence knew that Mabel was ill and might well not live through the summer at Cape May; and finally, that in her several meetings with Bishop, Mabel was always confident that the amendment had been drawn exactly as she wished. On the last point, there is nothing in the record which reflects unfavorably on the conduct of Mabel's attorney.

Counsel for the appellants stressed that there was no motive for the exertion of undue influence and argued that "motive is an essential element of a finding of undue influence." The issue of lack of motive appears not to have been stressed below, with the consequence that the chancellor did not specifically rule upon it. However, it occurs to us that a determination of motive in a case like this is much like a finding of malice in a homicide case, since both are derived from the entire set of circumstances although admittedly under a different burden. The fact that Florence and Robert are well-to-do did not necessarily extinguish the spark of cupidity.

Appellants' arguments against a finding of undue influence are, for the most part, logical and well taken. This Court reiterates what it has so often stated in the past, that the trial court is not only the judge of a witness' credibility, but is also the judge of the weight to attach to the evidence, *Frisoen v. Trapp*, 258 Md. 629, 633, 267 A. 2d 143 (1970). To prevail, the appellees need prove their case, not beyond a reasonable doubt, but by the preponderance of the evidence. There was credible evidence presented by both sides below, and it is ap-

parent that Judge Haile decided that the scales tipped in the direction of a finding of undue influence.

> "The will of a competent person cannot be nullified on the ground of undue influence, without affirmative evidence of sufficient probative force to carry to a mind the reasonable conviction of its existence and that it induced the action of the testator." *Malone v. Malone*, 148 Md. 200, 208, 129 A. 10 (1925).

We are convinced that appellees met their burden of adducing affirmative evidence of sufficient probative force to justify Judge Haile's determination that Mabel was induced to act by undue influence.

> *Decree affirmed, costs to be paid by appellants.*