VOCCI ET AL. *v.* AMBROSETTI

[No. 81, October Term, 1952.]

476

*Decided February 6, 1953.*

*Motion for rehearing, filed March 5, 1953, denied March 18, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*John Grason Turnbull* and *W. Lee Harrison* for the appellants.

*James A. Pine* for the appellee.

SOBELOFF, C. J., delivered the opinion of the Court.

The origin of this litigation lies in a family quarrel between expectant heirs of an enfeebled old man. The appeal is from a decree setting aside a conveyance made by him to his daughter, with whom he was living when the deed was executed.

The subject matter of the controversy is the property known as 1903 Monumental Road in Baltimore County, improved by a large and a small dwelling. The property was purchased by the appellee in 1923, and it is the only real estate he ever owned.

In 1945 he suffered a cerebral hemorrhage and paralytic stroke which left him weak and bedridden and in need of considerable attention. While it is agreed that he is not mentally incapacitated, the testimony portrays the appellee as a man emotionally dependent, vacillating and susceptible to influence from those around him.

The appellee is a widower. For two or three years following the stroke he lived with a daughter, Mary Vanuto, in the larger of the two houses above mentioned, but in January 1948 as a result of a meeting of his children he was transferred to the home of the appellants, his daughter Sadie Vocci and her husband on Central

Avenue in Baltimore City. There is evidence that he was then in extremely poor physical condition, his body being covered with scabs, sores and filth and his weight was only 89 pounds. The appellant, the daughter Sadie, claims that her faithful ministrations cured her father of these acute conditions and improved his general health. In the three years he was with her his weight increased to 135 pounds. About March, 1949, after the appellee had been living a little more than a year with his daughter Sadie, on Central Avenue, she and her family and the appellee moved into the Monumental Road house which apparently had been unoccupied since early 1948. The house was greatly in need of repairs, which the appellants and their son made, partly with funds withdrawn from the appellants' bank account, partly with their own monies and the labors of Sadie's husband and son who are carpenters.

On June 16, 1948, a few months after the father and his daughter Sadie and her family moved to Monumental Road, the father made a deed of the property to this daughter. It is absolute and unconditional in form. There was no apparent lack of family harmony till the latter part of 1948, when the appellee's other children— of whom there are altogether seven— discovered that the property had been transferred. The ill feeling between Sadie and her brothers and sisters grew in intensity, but no action was taken until June 3, 1951, about two and a half years after the discovery of the transfer. On that day the brothers and sisters acted with dramatic forcefulness. Without previous notice to the appellants or to the appellee, they came in a body to the Monumental Avenue house and over Sadie's objection—she says over the father's objection too—after breaking down the door they removed him to the home of his son Angelo. On July 30th, counsel for appellee and his children other than appellant demanded reconveyance of the property. This being declined, suit followed.

The appellee did not testify, but his pre-trial deposition was offered in evidence without objection. As

clarification of the factual issues surrounding the conveyance of the property it is far from satisfactory. Divergent inferences may be drawn from its very obscurity. Appellants argue that the deposition reveals appellee as not in fact master of the lawsuit and his children other than Sadie as really controlling it. Counsel for the appellee, on the other hand, would have it inferred that the vague answers to some questions and the failure to answer others illustrate his dependence and suggestibility. The contention on behalf of the appellee, in short, is that a deed made by such a man to a daughter who is looking after him is presumed as a matter of law to have resulted from undue influence if not actual fraud and coercion.

How the appellee's mental and emotional condition at the time of the deposition in September, 1951, compares with his condition when the deed was made more than three years earlier, in June, 1948, is uncertain. However this may be, he said through an interpreter in reply to his attorney's questions, that he did not know his age, the number of the house in which he was living, the amount of his pension, when the deed was made by him to his daughter, or who was present when he executed it by marking an X-mark. Several times he was asked through the interpreter if he wished the property returned and he made no answer, but later indicated that he wanted the property returned to him so that it might be shared equally by all his children after his death. Nevertheless he testified at least twice that the reason for the transfer was that Sadie promised to keep him all his life. Whatever may have been his state of mind when the transfer was made, certainly when the deposition was taken his position was that he was seeking a return of the property. Although at one point he denied saying that he did not want to go back to Sadie's, he nevertheless later in the deposition made it clear enough that he did not then want to go back to her and preferred to remain with Angelo. It is noteworthy that the appellee did not complain in his deposition about the treatment Sadie had

given him. The only explanation he offered for his unwillingness to return to Sadie, who certainly had not consented to his being taken away, is "because I can't walk."

The children who removed him from the Monumental Road home did not, however, plan for their father to remain permanently with Angelo. They agreed to shift him from one son or daughter to another every six months—a weird arrangement for a disabled man. If inability to walk could be the reason for appellee's refusal to return to the appellants, the reason would seem to operate with multiple force against shifting him periodically. Whether the assigned reason for not wishing to return was geniunely what influenced him, or was only a mask for some unexpressed reason, or reflected merely the confusion of the old man's mind, we have no way of being certain. So far as appellee's testimony could enlighten an inquirer as to this, the Chancellor who decided this case was in no better position than we to judge, for he never saw the old man but was limited to the written deposition.

The children who oppose Sadie insisted that they were justified in their action and indeed forced to it by Sadie's neglect and mistreatment of the father. Their complaints against her and their description of the father's condition in June 1951, when they took him from her, sounds very much like her own testimony about Mary's earlier treatment of the sick man and his condition in 1948 when the children united in bringing him from Mary's to Sadie's home. As to the testimony other than the deposition the Chancellor was in a superior position to appraise it, for he did see and hear the witnesses.

Aside from the palpably partisan and embittered testimony of the children there was testimony from three disinterested witnesses. One of these, Mr. Hector Ciotti, a lawyer of standing, testified that he spoke twice to the appellee before the execution of the deed in the early summer of 1948. According to Mr. Ciotti, who conversed with him in Italian, the language the appellee

understood best, the full purport of the deed was explained and comprehended. According to this testimony the appellee clearly realized that the deed would exclude the other children from participation in the property which constituted practically his entire estate, and he declared his desire for Sadie to have it "because she will take care of me as long as I live."

Anthony Deleonibus, another witness called by the appellants, had visited the appellee both when he lived with Mary where he said the appellee was poorly cared for and allowed to be in a filthy condition, and when he lived with Sadie, both on Central Avenue and Monumental Road, where he said he observed the cleanliness and kindness of the treatment. He quoted the appellee as telling him that he had given the houses to Sadie because "she has been taking care of me and I am satisfied to stay with her and I am really happy here."

The third disinterested witness was Leonard Spina, the next door neighbor on Monumental Road who furnished strong corroboration of the appellants' claims. According to him, Mary had treated the appellee "like a dog" when he became sick, while Sadie kept him clean, fed him well and made him happy. He also related that the appellee told him he gave the property to Sadie because nobody else wanted him and she (Sadie) was giving him the best of care. He described the dilapidated condition of the house when the appellants took over, and the personal labors of the appellants and their son in effecting improvements.

If this were all the testimony, then notwithstanding the fact that the only witnesses unaffected by the passions of the controversy and interest in its outcome support the appellant's version, we should be strongly inclined to subordinate our impressions of the facts and to uphold the able and experienced Chancellor who had the great advantage of observing the witnesses as they appeared in court. There was, however, in addition to the testimony heretofore outlined, a considerable volume of testimony on the part of the brothers and

sisters in which they undertook to recite various alleged self serving statements of the appellee made out of the presence of the appellants. These children may of course testify to what they claim to have observed and to any alleged conversations between them and the appellants. However, they undertook to tell of conversations they had with the father at various times the effect of which, if believed, must be damaging to the appellants. What the appellee failed to say in his deposition as to the circumstances surrounding the execution of the deed, his sons and daughters (other than Sadie) undertook to supply by repeating alleged statements made to them by the appellee. Some of these were as late as the night before the trial and three years after the events to which they relate. Whereas, from the appellee's scarcely articulate deposition nothing appears which suggests active solicitation on the part of the appellants to procure the deed, her brothers and sisters supply a long chain of testimony—distinct, clear and highly specific—as to conversations with their father about Sadie's alleged nagging to obtain the transfer of the property. The Chancellor's first reaction was against the admission of such testimony, in recognition of the established rule of evidence. Later, however, he reversed his ruling and allowed the members of the family to offer in support of the appellee's case an avalanche of conversations they claimed to have had with him. All of these occurred out of the appellants' presence and many months—even years—after the appellee had passed into the custody of those hostile to the appellants.

The ruling was made in the stress of a hotly contested trial when there was little time for reflection. The Chancellor was aware of course of the laws of evidence generally applicable to such testimony, but voiced his impression that there might be a more liberal rule in cases of this character.

Appellee does not here defend the admission of this testimony of the sons and daughters who undertook to quote their father's self-serving statements, but he argues

that the appellant cured the error by cross-examining the witnesses and by offering in evidence disserving statements of the appellee. With this we cannot agree.

The rule is stated by *Wigmore,* section 1362: "The theory of the hearsay rule is that the many possible deficiencies, suppressions, sources of error and untrustworthiness, which lie underneath the bare untested assertion of a witness, may be best brought to light and exposed by the test of cross-examination. * * * It is here sufficient to note that the Hearsay rule, as accepted in our law signifies a rule rejecting assertions, offered testimonially, which have not been in some way subjected to the test of cross-examination."

In *Evans v. Buchanan,* 183 Md. 463, 473, 38 A. 2d 81, 85, the lower court had refused to allow witnesses to testify to certain statements made out of the presence of the opposing party. In sustaining the ruling this court speaking through Chief Judge Marbury, said: "These were self-serving declarations. And the rule is well established that declarations of a party favorable to himself are not admissible unless made in the presence of the other party or as a part of the *res gestae,* or in contradiction of evidence previously given. *Jones v. Dugan,* 124 Md. 346, 92 A. 775; *Takoma Park Bank v. Abbott,* 179 Md. 249, 19 A. 2d 169. It is stated in 20 Am. Jur., *Evidence,* par. 558, page 472, that a few courts hold that self-serving declarations are admissible to rebut disserving declarations, and the case of *Bowie v. Stonestreet,* 6 Md. 418, 61 Am. Dec. 318, is cited as authority. But this case holds only that if the declarations or admissions of a party are to be used for a purpose adverse to his claim, those made at the same time which are in his favor must be also received. We feel that the Chancellor was correct in refusing to admit this testimony."

The challenged testimony does not qualify under this test. There is no merit in the appellee's contention that the appellants' objection was waived because they later, or even before the admission of the objectionable hearsay, offered appellee's disserving declarations. Disserving

statements or admissions against interest are received in evidence on entirely independent grounds, and they would not open the door to favorable statements unless made at the same time.

Nor does a party who objects to inadmissible testimony lose his objection by exercising his right of cross-examination. See *United Railways v. Corbin,* 109 Md. 442, 455, 72 A. 606.

This court is always reluctant to reverse a judgment or decree for errors in rulings on questions of evidence, particularly when the case has been fully and carefully tried. Where the volume of improperly admitted testimony is considerable and its character such that if believed it may have influenced the result, a closer question arises. Judges are better disciplined than jurors in disregarding testimony which they hear but which their legal training admonishes them should be excluded from consideration. Where, however, the judge has ruled testimony legally admissible and it is apparently cogent, it cannot be assumed without further inquiry that it was harmless even if erroneous.

In this case we have the benefit of the Judge's opinion explaining in detail his mental processes in deciding the issues. He found as a fact that in the light of the appellee's physical and emotional condition during his stay with his daughter Sadie, and particularly about the time of the transfer, there was a confidential relationship in which he was the dependent and she the dominant party. This as a matter of law cast upon her the burden of proving the fairness of the entire transaction. Where the transaction is found on careful scrutiny to be fair the confidential relation alone will not upset the grant, and the mere fact that the grantor later changed his mind will not justify a court in undoing it. *Hoffman v. Rickell,* 191 Md. 591, 62 A. 2d 597. To set it aside it is not necessary to find that she acted fraudulently. In *Theide v. Startzman,* 113 Md. 278, 287, 77 A. 666, 670, the Court quoting *Highberger v. Stiffler,* 21 Md. 338, said: " 'Wherever a fiduciary relation exists, legal or

actual, whereby trust and confidence are reposed on the one side, and influence and control are exercised on the other, Courts of Equity, independent of the ingredients of positive fraud, through public policy as a protection against overweening confidence, will interpose to prevent a man from stripping himself of his property. *Story's Eq.*, secs. 303-322. *The relation requires the parties to abstain from all selfish projects.* The general principle is, if a confidence is reposed and that confidence is abused, Courts of Equity will grant relief. In such cases it is not necessary to prove the actual exercise of overweening influence, misrepresentation, importunity or fraud *aliunde* the act complained of * * * The general rule is that he who bargains in a matter of advantage with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence, *a rule applying equally to all persons standing in confidential relations to each other.'* "

This rule the trial judge recognized; and while we are of the opinion that the appellee did not act with conscious inequity the fairness of the transaction in practical operation is in issue. If there is doubt as to this substantive question, then, apart from motives, she has not met the burden the law puts on her. In this connection the court pointed out that the will made by the appellee in 1940 treated all the children equally. Ordinarily this would have little significance, for when in good health he might well plan equal distribution of his estate after death; yet he might naturally enough when conditions had changed decide on a different deposition. It was also pointed out in the court's opinion that the daughter Mary, who had the appellee in her care for seven years before he went to Sadie, did not receive special favor either in the 1940 draft of the will or by way of a transfer *inter-vivos*. But these circumstances are not in our view highly important, for again it is possible to explain them on the score of the difference in treatment that may have been given him by the two daughters. Or, it might have been the appellee's thought

in 1948, when the deed was made, that Sadie merited it on account of her good treatment of him plus her promise to care for him for the remainder of his days. One could speculate about this endlessly and still not be certain as to what really happened between the parties. It is precisely because of this difficulty that the law as a practical expedient imposes the burden on the grantee.

If we were left in doubt as to the basis of the court's decision, or thought there was a substantial likelihood that the result was affected by the improperly admitted testimony, then we should not think it fair to the appellants to let the decree stand. Even if we considered it likely that the objectionable testimony seriously influenced the court in judging the credibility of the appellants on the main issue, we should deem it best to order a retrial. After a careful study of the transcript and of the court's opinion we are, however, convinced that while the whole line of statements attributed to the appellee by his sons and daughters should have been excluded, the court did in fact pitch his decision on another ground.

This is not a case like *Long v. Huseman,* 186 Md. 495, 47 A. 2d 75, where the agreement of the daughter to care for her mother in consideration of a deed of the home was made impossible of performance by the acts of the daughter herself and her husband who made conditions in the home intolerable for the mother. That was a much simpler case. Nor is this the ordinary case of a person who acted freely but later changed his mind, such as we had in *Hoffman v. Rickell,* 191 Md. 591, 62 A. 2d 597. *Cf. Kincaid v. Miles,* 193 Md. 620, 69 A. 2d 268. Here the agreement of the appellant-daughter to look after the appellee is frustrated by the removal of the father. It may be that the appellant's brothers and sisters were unkind and unjust to her in removing their father from her home, and particularly in the manner they adopted in removing him. It is not their rights but their father's rights which are being tested here.

Let us assume that the appellant was not at fault. The legal problem is whether it is equitable under the circumstances here for the appellee to be held to his bargain in the same degree as the ordinary contracting party; or should the court hold that the object of the transfer having become unrealizable the deed should be voided? We have not been directed to a case precisely in point. We have concluded that without formulating a broad rule, and limiting ourselves to the circumstances of this case, this absolute deed should not be permitted to stand.

In fashioning the decree the Judge might have let the deed stand but qualified its absolute character by making it subject to the condition that the appellant shall give the appellee lifetime care as originally contemplated. This could have been made effective only by adopting the suggestion urged by appellants' counsel, that appellee "be permitted to remain with his dissatisfied heirs without the return of the property, until such time as the others [*i.e.*, Sadie's brothers and sisters] are willing to return him to the care of the appellants as they did once before." This would seem too Draconian a measure to apply to a bewildered old man pulled hither and yon by his contentious children. (He did say, logically or not, in his deposition that he did not wish to return to Sadie.) Recoiling from the application of such a severe sanction against the appellee, the Chancellor sought an alternative method. He decreed that the property be reconveyed to a trustee to be held for the appellee, but subject to a lien in favor of the appellants for what they have invested in improvements to the property. Toward their expenses they have already obtained $2,000 of the appellee's funds (practically all he had) and the proceeds of a $4,000 mortgage they put on the property, and the lien of the decree is for an additional $1,000. Also they have lived in the large house and have collected and will retain some rent derived from the small one. Considering the obvious inconvenience to the appellants this provision for them is not lavish but it cannot be regarded as shockingly

inadequate. They are relieved of responsibility and expense of the father's care, and the brothers and sisters presently having the appellee in their charge are not being paid, except the modest $82.00 monthly pension just as the appellants received the pension money when they had the father with them. The $82.00 per month received by the appellant while she had the appellee will probably compensate her for out of pocket expenses in his care.

As a practical matter, the decree has the supreme merit of preserving the property as a protection to the appellee against the time when none of his children may be able or willing to maintain him; and the decree achieves this without ignoring appellants' equities.

We are not unmindful that the rotating arrangement for the appellee's care is far from satisfactory. On suitable application of any interested person should the facts warrant it the court may make other provision for him; and if the question should arise the court would not be limited to the testimony of the quarreling sons and daughters, but could have objective and disinterested testimony from a competent social service agency as to conditions in the home where the appellee might then be. Indeed, this case falls into the realm of social case work not less than that of an equity court.

The defense of laches which has been urged cannot be sustained. Laches would have to be applied very leniently in such a case as this, considering the appellee's own condition and circumstances. Moreover, it is to be noted that the appellants moved into the Monumental Avenue house before the deed was made and not in reliance upon it.

Finding that the action of the trial court is free from harmful error and that it achieves substantial justice in a difficult situation, the decree will be affirmed.

*Decree affirmed, with costs.*