753 A.2d 4

**Lawrence UPMAN et al.**

v.

**Kenneth CLARKE et al.**

**No. 120, Sept. Term, 1999.**

Court of Appeals of Maryland.

June 6, 2000.

J. Brooks Leahy (Dulany & Leahy, LLP, on brief), Westminster, for petitioners.

Howard A. Roland, Baltimore, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

WILNER, Judge.

Under Maryland common law, there are two very different burdens and standards of proof that may be applicable when a gift is challenged on the ground that the donee exercised undue influence over the donor. As we shall explain, when the challenged gift is an *inter vivos* one—a present gift made during the donor's lifetime—and the person attacking the gift establishes that a confidential relationship existed between the donor and the donee, there is a presumption against the validity of the gift, and the burden shifts to the donee to establish, by clear and convincing evidence, that there was no abuse of the confidence. When the gift is testamentary, however, taking effect upon the death of the donor, the existence of a confidential relationship between the donor and donee is simply one suspicious circumstance to be considered; it does not, of itself, give rise to a presumption of invalidity, and the burden remains with the person challenging the gift to prove a substantially overbearing undue influence.

The principal issue before us now is which of those two rules applies when the gift is made through the device of a revocable trust under which the donor presently transfers legal title to property to the donee, as trustee, and provides for the testamentary disposition of that property to the donee upon the death of the donor. In the circumstances of this case, we shall hold that the rule applicable to testamentary gifts applies.

## BACKGROUND

Genevieve Upman, widowed since 1967, died childless on March 1, 1996, at the age of 88. Under her Last Will and Testament, dated August 28, 1995, her entire estate, after payment of taxes and expenses, was left to the Genevieve Upman Trust. The trust was initially created in June, 1994, but was amended by Ms. Upman in September, 1995. Under the 1995 amendment, the net trust estate was to be distributed, in equal shares, to Ms. Upman's nephew, Kenneth Clarke, and his wife, Patricia, "in gratitude for the care and affection extended to me in my declining years."

After the Will was admitted to probate, several other nephews and nieces of Ms. Upman, who had been named as beneficiaries under prior Wills, filed proceedings attacking the Will and the 1995 amendment to the trust. In the Orphans' Court for Carroll County, they filed a caveat to the Will, contending that Ms. Upman lacked testamentary capacity when she signed the Will and that the Will was procured by the exercise of undue influence by Kenneth and Patricia Clarke. In an action filed in the Circuit Court for Carroll County, they sought to invalidate the 1995 amendment to the trust, contending that Ms. Upman was not competent when she executed that amendment and that the Clarkes, as relatives and caretakers of Ms. Upman, took advantage of a confidential relationship between her and them and improperly influenced her to make the gift to them through the 1995 amendment to the trust.

The issues raised in the caveat proceeding were transmitted to the Circuit Court and consolidated with the action challenging the amendment to the trust. Because the Will and the 1995 amendment to the trust were executed within a week of each other, the parties agreed that the evidence relating to both competence and undue influence would be the same with respect to both instruments. The caveat issues were resolved by a jury, which, in special verdicts, determined that Ms. Upman did not lack testamentary capacity when she executed

the August, 1995 Will and that the Will was not procured by the exercise of undue influence on the part of either Kenneth or Patricia Clarke. In the second action, which was decided by the court without a jury, the Clarkes admitted that they had a confidential relationship with Ms. Upman. Relying on cases dealing with undue influence attacks on *inter vivos* gifts, the court concluded that, once a confidential relationship is found, the burden falls on the trusted party—in this case the Clarkes—to show that their conduct was proper. The court found, however, that the Clarkes had met that burden and that there was no undue influence.

The plaintiffs abandoned their attack on the Will but appealed the judgment entered for the Clarkes with respect to the 1995 amendment to the trust. The Court of Special Appeals affirmed that judgment, but not entirely on the basis used by the Circuit Court. *Upman v. Clarke*, 127 Md.App. 628, 736 A.2d 380 (1999). The appellate court concluded that the revocable trust created by Ms. Upman was more in the nature of a testamentary disposition than an *inter vivos* gift and that, as a result, the Circuit Court erred in shifting the burden to the Clarkes to prove non-abuse of the confidential relationship. It concluded instead that the burden remained with the plaintiffs to prove that the 1995 amendment was the product of undue influence. That error did not require reversal, however, as it actually favored the plaintiffs. The Court of Special Appeals reviewed the evidence and concluded that it more than sufficed to support the Circuit Court's finding that the 1995 amendment was the free and voluntary act of Ms. Upman. *Id.* at 648, 736 A.2d at 391.

Until March, 1995, Ms. Upman lived alone in her home in Ellicott City—the marital home she had shared with her husband. At some point, she began to suffer from polymyositis—a chronic arthritic problem—and from and after the mid-1980's, she began to rely on her niece, Christine Healey, one of the plaintiffs, and Kenneth Clarke for some assistance in maintaining her home, with various errands, and with paying bills and keeping her checkbook. In 1989, at Ms. Upman's request, Ms. Healey arranged for a lawyer to prepare a Will

for Ms. Upman. In that Will, signed in December, 1989, Ms. Upman left her stocks and bonds to 14 nephews and nieces, in equal shares. She directed that any real estate—her house—be sold and that 50% of the proceeds be distributed to three nieces and a nephew of her late husband, and that the rest of her estate, including the other 50% from the sale of her home, be distributed to her five brothers and sisters, Mr. Clarke, and Ms. Healey. Ms. Healey was designated as personal representative.

In 1991, the Clarkes contacted another attorney—one who had done some work for them in the past—and had another Will drawn for Ms. Upman. In this second Will, signed in April, 1991, Ms. Upman left her stocks and bonds to an expanded group of 20 nieces and nephews. A specific bequest of $1,000 to her church was added. The disposition of the real estate and the balance of the estate remained unchanged. Ms. Healey and Mr. Clarke were named as co-personal representatives.

In May, 1994, Ms. Upman signed a third Will, which made no substantial changes from the second, and, a month later, she created a revocable trust—the Genevieve Upman Trust. Ms. Upman named herself as the sole trustee and directed that she be paid from the trust, during her lifetime and as long as she remained mentally capable of managing her own affairs, so much of the income and principal of the trust as, from time to time, she requested. Ms. Upman reserved the right to revoke or amend the trust and to appoint a successor trustee. In the event of her death or inability to manage her own affairs, she designated Ms. Healey and Mr. Clarke, jointly, as successor trustees. She directed the trustees, during any period that she was unable to manage her affairs, to distribute so much of the income and principal, for her benefit, as they believed desirable for her care and support. Ms. Upman directed that, upon her death, her estate be distributed to those persons, and in the shares, specified in her latest Will.

There is some conflict in the evidence as to what property was placed in the trust. The Declaration of Trust referred to

an attached Schedule A, which provided for the transfer of Ms. Upman's Ellicott City home and the furniture "and other personal property" in it. There is no reference either in that Schedule or in any later document to any transfer of Ms. Upman's bank accounts, stocks, or other cash or securities. It appears, however, that stocks, bonds, and bank accounts were, indeed, transferred to the trust. The Information Report and accompanying Inventory filed with the Register of Wills after Ms. Upman's death showed that approximately $213,000 in assets had been transferred to the trust in June, 1994, including $12,000 in U.S. Savings Bonds, $17,500 in stock, over $46,000 in bank accounts, Ms. Upman's Ellicott City property valued at $135,000, and $2,300 in other tangible personal property. Counsel for plaintiffs informed the court that about 95% of Ms. Upman's property was in the trust and that only $8,000 to $9,000 passed through the probate estate. The transfer of those assets is also consistent with the direction that she receive, on request, income and principal from the trust estate during her lifetime; indeed, the failure to place those liquid, income-producing assets in the trust at that time would be *in* consistent with that provision.

In March, 1995, Ms. Upman suffered a fall in her home. It is not clear what prompted the fall. There was a suggestion in the hospital records that she may have had a seizure; Ms. Clarke postulated that she may have become disoriented from taking too much of a sedative that had recently been prescribed for her. She was found by Ms. Healey on the floor in a confused state and was taken to the hospital, where she remained for eight days. This episode created a crisis for Ms. Upman. In addition to her chronic arthritis, she was diagnosed with a collection of other maladies, including vasculitis, osteoporosis, an inflamed ulcer on an ankle, and progressive dementia. She was reported as weak and confused. The hospital discharge summary stated that she "now needs close observation."

It was clear that Ms. Upman could not return to her home, to live alone. Several options were considered by the family.

Ms. Healey thought that, given the extensive care she would need, Ms. Upman should be placed in a nursing home or similar kind of facility, a prospect that Ms. Upman adamantly opposed. Ultimately, the Clarkes agreed to have her live with them, and they prepared a separate room for her in their home. Ms. Upman remained in the Clarkes' home for about 11 months, until she died. Ms. Clarke assisted her in most of her daily activities—dressing, eating, bathing, even going to the bathroom. The Clarkes assumed control of her checkbook and paid her bills.

In August, 1995, Ms. Clarke asked the lawyer who had prepared the second and third Wills and the revocable trust to prepare a new Will and an amendment to the trust. The attorney prepared the documents and sent them to Ms. Upman, along with a letter stating that, if she wished, the attorney would come to the home to answer any questions she might have. Ms. Upman did not respond, other than to send the attorney a check for his services along with a "thank you" note. On August 28, 1995, Ms. Upman signed the Will in the presence of two neighbors of the Clarkes. Her signature to the trust amendment required notarization, so on September 3, 1995, Ms. Clarke took her to the local bank where, before a notary, she signed the amendment.

As noted, the new Will and the trust amendment made a substantial change in Ms. Upman's estate plan. The Will directs the payment of debts, taxes, funeral, last illness, and administration expenses and leaves the entire balance of the estate to the Genevieve Upman Trust. The new provision added to the trust directs the payment of any debts, taxes, and administration expenses not paid by the probate estate and provides that all remaining property in the trust be distributed to the Clarkes. Ms. Upman's siblings and other nieces and nephews were dropped as beneficiaries.

## DISCUSSION

In the Circuit Court, the plaintiffs challenged the two 1995 instruments on competence as well as undue influence

grounds, and much of the evidence concerned Ms. Upman's mental capacity. That evidence was in some conflict. The plaintiffs did not contest Ms. Upman's competence or testamentary capacity with respect to any of the instruments signed prior to 1995. It was their position that she deteriorated significantly after signing the 1994 instruments and that she remained in a confused and helpless state, entirely dependent on the Clarkes. They stressed her age, her frail physical condition, the fact that her physician believed, in March, 1995, that she suffered from progressive dementia, and incidents in which she seemed confused as to dates, was forgetful, or appeared to suffer from some delusions.

Testimony presented by the lawyer who prepared the 1991, 1994, and 1995 instruments, by the witnesses to the 1995 Will, and by the notary who attested her signature to the 1995 amendment to the trust, on the other hand, was to the effect that Ms. Upman was alert, knew what she was doing, and appeared to be acting voluntarily. There was abundant evidence from them, from the Clarkes, from an outreach person from the church who visited Ms. Upman from time to time, and from others sufficient to show that Ms. Upman (1) changed her mind about leaving her estate to between 14 and 20 people, with whom she had only infrequent contact, (2) was content living with the Clarkes, and (3) was deeply grateful to them for taking care of her and avoiding her placement in a nursing home.

As we indicated at the commencement of this Opinion, two different rules have developed under Maryland law with respect to challenges based on undue influence. The first question in need of resolution, whether the gift under attack is an *inter vivos* or a testamentary one, is whether a confidential relationship existed between donor and donee. We have spoken often about confidential relationships, but we have rarely attempted to define the concept. In *Green v. Michael,* 183 Md. 76, 84, 36 A.2d 923, 926 (1944), we regarded dependence as the key factor, holding that "[t]o establish such a relationship there must appear at least a condition from which

dependence of the grantor may be found" (quoting *Snyder v. Hammer*, unreported in 180 Md. 690, 23 A.2d 653, reported in full in 180 Md. 690, 23 A.2d 653, 655 (1942)). Most of our discussion has been in the context of when a confidential relationship may be "presumed" although, in context, the word "found" may be more accurate. In *Green*, we stated that, in general, "a confidential relationship may be presumed whenever two persons stand in such a relation to each other that one must necessarily repose trust and confidence in the good faith and integrity of the other." *Green, supra,* 183 Md. at 84, 36 A.2d at 926. *See also Tracey v. Tracey,* 160 Md. 306, 318, 153 A. 80, 85 (1931) (confidential relationship may be presumed from a relationship "such that one must from the very necessities of the situation repose confidence in the other, and where the one in whom such confidence is reposed is thereby enabled to exert a dominating and controlling influence over the other").

In some relationships, such as attorney-client or trustee-beneficiary, a confidential relationship is, indeed, presumed as a matter of law. Otherwise, and particularly in family relationships, such as parent-child and husband-wife, the existence of a confidential relationship is an issue of fact and is not presumed as a matter of law. *See Sanders v. Sanders,* 261 Md. 268, 276, 274 A.2d 383, 388 (1971). Here, as noted, the Clarkes admitted that they had a confidential relationship with Ms. Upman when she signed the 1995 Will and trust amendment, so that much is not in dispute.

In the case of an *inter vivos* gift, the existence of a confidential relationship shifts the burden to the donee to show the fairness and reasonableness of the transaction. As we held in *Sanders, supra,* 261 Md. at 276–77, 274 A.2d at 388:
"In other words, once the relationship is proved, the plaintiff is relieved from the necessity of proving 'the actual exercise of overweening influence, misrepresentation, importunity, or fraud,' and the defendant has the burden of showing that a fair and reasonable use has been made of the confidence, 'that the transfer of the property was the delib-

erate and voluntary act of the grantor and that the transaction was fair, proper and reasonable under the circumstances.' "

(citations omitted).

 We have described the donee's burden as a "heavy" one, *Sanders, supra,* 261 Md. at 277, 274 A.2d at 388, of establishing by clear and convincing evidence that there has been no abuse of the confidence. *Wenger v. Rosinsky,* 232 Md. 43, 49, 192 A.2d 82, 86 (1963). In *Green, supra,* 183 Md. at 85, 36 A.2d at 927, we said, in the context of an *inter vivos* transfer, that "[w]here a confidential relationship exists, the courts will not allow a transaction between the parties to stand unless there is a full and fair explanation of the whole transaction."

 The rule governing attacks on Wills is very different. In *Koppal v. Soules,* 189 Md. 346, 351, 56 A.2d 48, 50 (1947) and *Stockslager v. Hartle,* 200 Md. 544, 547, 92 A.2d 363, 363–64 (1952), we distilled from earlier cases that, in attacking a Will on the ground of undue influence, the burden of proving the undue influence is on the one attacking the Will and that:

> "undue influence which will avoid a will must be unlawful on account of the manner and motive of its exertion, and must be exerted to such a degree as to amount to force or coercion, so that free agency of the testator is destroyed. The proof must be satisfactory that the will was obtained by this coercion ... or by importunities which could not be resisted, so that the motive for the execution was tantamount to force or fear. Mere suspicion that a will has been procured by undue influence, or that a person had the 'power unduly to overbear the will of the testator' is not enough. It must appear that the power was actually exercised, and that its exercise produced the will."

(citations omitted). *See also Knowles v. Binford,* 268 Md. 2, 298 A.2d 862 (1973); *Moore v. Smith,* 321 Md. 347, 582 A.2d 1237 (1990).

There is a rational basis for the two different rules. Persons ordinarily desire to retain possession and use of their property while they are alive. If someone who stands in a fiduciary or confidential relationship with another exerts *any* influence on that person to obtain an *inter vivos* transfer of the person's property, for less than full value, that influence is regarded, at least presumptively, as undue and requires an explanation. The exertion of influence for personal gain is, itself, a breach of the trust implicit in the confidential relationship, especially when it causes the person reposing trust to be deprived of his or her property. Thus, in *Vocci v. Ambrosetti,* 201 Md. 475, 485, 94 A.2d 437, 442 (1953), we stated the general rule to be that "he who bargains in a matter of advantage with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence" and concluded that the relationship itself requires the dominant party "to abstain from all selfish projects."

A testamentary gift is different. Obviously, persons can no longer enjoy property after their death; they suffer no loss from a testamentary gift. Testamentary gifts are thus more natural and expected, and the persons most likely to receive them are those who often *do* stand in a fiduciary or confidential relationship with the donor—parents, children, spouses, siblings, close friends, trusted employees. In *Shearer v. Healy,* 247 Md. 11, 25, 230 A.2d 101, 107–08 (1967) and later in *Anderson v. Meadowcroft,* 339 Md. 218, 227, 661 A.2d 726, 730 (1995), drawing on principles stated earlier in *Parfitt v. Lawless,* 2 P. & D. 468 (1872), *Griffith v. Diffenderffer,* 50 Md. 466, 483–84 (1879), and *Sellers v. Qualls,* 206 Md. 58, 72, 110 A.2d 73, 80 (1954), we observed:

"there is an obvious difference between a gift whereby the donor strips himself of the enjoyment of his property while living and a gift by will, which takes effect only from the death of the testator. In cases of gifts by will the fact that a party is largely benefited by a will prepared by himself is nothing more than a suspicious circumstance of more or less weight according to the facts of the case."

The instrument before us has features of both an *inter vivos* gift and a testamentary one. To the extent that Ms. Upman transferred legal title to her property to the Clarkes and authorized them, as trustees, to deal with that property, there was an *inter vivos* transfer—an immediate parting of legal title. Although it appears that the property was placed in the trust in 1994, it was the 1995 amendment that made the Clarkes the trustees and thus it was that amendment that effected a transfer of legal title to the property from Ms. Upman, as trustee, to the Clarkes, as trustees. On the other hand, the actual gift to the Clarkes was predominantly testamentary, for two reasons. First, because Ms. Upman reserved the right to revoke the trust, she retained the power, with the stroke of a pen, to undo the transfer and recover full legal title to the property, at any time and for any reason. Second, although the Clarkes were entitled to exercise trust powers over the property, they had no right to beneficial enjoyment of it until Ms. Upman's death. They were limited, in their immediate control over the property, to their authority as trustees.

We dealt with this issue, albeit without much discussion, in *Knowles v. Binford, supra,* 268 Md. 2, 298 A.2d 862, in which, as here, an attack was made on a revocable trust by disappointed relatives. The settlor created the trust in 1959, placing in it certain securities. The income and so much of the principal as she requested was to be paid to her during her lifetime, and upon her death, the trustee was to pay estate and inheritance taxes, funeral and medical expenses, and certain lump sums to named individuals, continue the trust for the benefit of the settlor's brothers, and, upon their death, to pay the remaining balance to her nieces and nephews. In time, she moved from Baltimore to Philadelphia and thus had less frequent contact with her Baltimore nieces, especially after the deaths of her two brothers, and she came under the domination of a friend and the friend's nephew. In October, 1969, she executed an amendment to the trust that, upon her death, left the entire estate to the friend for life, with the remainder to the friend's nephew. The nieces who were thus

disinherited sued to have the 1969 amendment declared invalid on the ground of mental incompetency and undue influence exercised by the friend and her nephew.

The attack involved only the revocable trust. There was no Will at issue. Nonetheless, we obviously regarded the trust as testamentary in nature. In determining whether the amendment was invalid because of undue influence, we not only applied the substantive standard applicable to caveats to Wills—those set forth in *Stockslager v. Hartle, supra,* 200 Md. 544, 92 A.2d 363—rather than the standards applicable to *inter vivos* gifts, *id.* at 4–5, 298 A.2d at 863, but made clear that the burden of proof on the issue was with those attacking the trust. *Id.* at 11, 298 A.2d at 866. In the particular case, the Circuit Court had found from the evidence that the amendment *was* the product of undue influence, and we affirmed that determination. The only difference between *Knowles* and this case, apart from the evidence bearing on undue influence, was the fact that the trustee, throughout, was a bank, not the beneficiaries. It is a difference without significance, however, for, as we have said, the Clarkes in this case had no beneficial use of the property by virtue of their status as trustees.

The approach taken in *Knowles* is consistent with that used in other States. In *Mercado v. Trujillo,* 980 P.2d 824 (Wyo. 1999), a case close in point, a revocable trust attacked as the product of undue influence was treated as a testamentary disposition and the burden of proof was placed on the contestant. In *In re Estate of Tisdale,* 171 Misc.2d 716, 655 N.Y.S.2d 809 (Sur.Ct.1997), the issue was whether a proceeding to set aside a revocable trust on grounds of undue influence and fraud was triable before a jury. Under New York law, a probate contest involving a Will was triable before a jury. Noting that revocable trusts are frequently used as substitutes for wills, often in order to avoid court supervision of estate administration, the court concluded that "[t]he substantial similarity between revocable trusts and wills (and the illusory concept of a revocable trust as a contract) mandates the conclusion that the nature of the relief requested in a

proceeding to set aside a trust is the same as the nature of the relief requested in a proceeding to set aside a will." *Id.* at 811. *Compare In re Estate of Aronoff,* 171 Misc.2d 172, 653 N.Y.S.2d 844 (Sur.Ct.1996), reaching an opposite conclusion with which the *Tisdale* court disagreed.

In *Ullman v. Garcia,* 645 So.2d 168 (Fla.Dist.Ct.App.1994), the court held that the guardian of an incapacitated settlor could not challenge a revocable trust, on the ground of undue influence, during the settlor's lifetime. That result was dictated by a Florida statute, but, according to the court, "the reasoning behind this rule is that the devisee of a revocable trust does not have any control over ownership of the trust property until the settlor's death." *Id.* at 169. The retention of control exercisable through the power to revoke the trust distinguishes a revocable trust from other types of conveyances. The court noted that an *inter vivos* gift is complete when made—the donor retains no control over the property—but that, with a revocable trust, the devisee does not come into possession until the settlor's death, and even that interest is contingent upon the settlor not exercising the retained power to revoke. *See also Davison v. Feuerherd,* 391 So.2d 799 (Fla.Dist.Ct.App.1980), holding that an action for tortious interference with an expected bequest, cognizable with respect to expected bequests by Will, would also lie with respect to a revocable trust. The court observed that "no real distinction exists between gifts of inheritance through a will and gifts through a revocable trust," that "[b]oth forms of giving create only an expectancy in the beneficiary and, in both forms, the donor has the privilege of changing his mind." *Id.* at 802.

In *Haynes v. First Nat'l State Bk.,* 87 N.J. 163, 432 A.2d 890 (1981) and *Raimi v. Furlong,* 702 So.2d 1273 (Fla.Dist.Ct. App.1997), a Will and a revocable trust which, as here, were part of a testamentary scheme, were challenged on the ground of undue influence. The courts treated both instruments as testamentary and applied the same standard to both.

The plaintiffs cite a number of cases in which we treated gifts of interests in bank accounts as subject to the standards

applicable to *inter vivos* gifts, notwithstanding that some of those accounts were in trust form, as indicative of a view that a gift in trust is nonetheless an *inter vivos* gift. *See, e.g., Owings v. Owings,* 233 Md. 357, 196 A.2d 908 (1964); *Hancock v. Savings Bank of Baltimore,* 199 Md. 163, 85 A.2d 770 (1952); *Benedict v. Warehime,* 187 Md. 150, 49 A.2d 444 (1946); *Reil v. Wempe,* 145 Md. 448, 125 A. 738 (1924); *see also Midler v. Shapiro,* 33 Md.App. 264, 364 A.2d 99 (1976). What plaintiffs overlook, however, is that a gift of a bank account, or a joint interest in a bank account, grants the donee immediate access to funds in the account. Indeed, the terms governing such accounts often allow the donee to deplete the funds in the account at any time, with or without the donor's consent. *See Kornmann v. Safe Deposit & Trust Co.,* 180 Md. 270, 274, 23 A.2d 692, 694 (1942) (standard language used in joint bank accounts in trust form—"subject to the order of either"—does not make the power of withdrawal joint, but, rather, the power to withdraw "exists completely in each beneficiary, with the power of separate and independent exercise" and either trustee may "appropriate to her own use all of the money on deposit in [the] account") (citations omitted). The trust at issue here, by contrast, did not confer an immediate benefit on anyone other than Ms. Upman. This especially holds true because the Clarkes never attempted to exercise any beneficial control over the trust to strip Ms. Upman of income and principal.

The trust here, even with the 1995 amendment, is clearly more akin to a testamentary instrument than to an *inter vivos* gift, and, for that reason, the Court of Special Appeals was correct in allocating the burden of proving undue influence to the plaintiffs. We need not decide here whether, had the Clarkes actually disposed of the assets of the trust or exercised substantial control over them to the detriment of Ms. Upman, the result would be different. Whether an instrument of this kind is to be regarded as testamentary or *inter vivos* may depend on how it is, in fact, implemented.

■ We agree as well with the intermediate appellate court's conclusion that the Circuit Court's incorrect allocation of the burden of proof to the Clarkes does not require any remediation. There can be no doubt that, having found sufficient evidence to rebut the presumption it created of undue influence, it would necessarily have found insufficient evidence to show undue influence had it applied the appropriate burden and standard of proof. That evidence was more than adequate to show no abuse of the confidential relationship.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.